TERRITORY OF HAWAII BY THE PUBLIC UTILI- TIES COMMISSION OF THE TERRITORY OF HAWAII *v.* INTER-ISLAND STEAM NAVIGA- TION COMPANY, LIMITED.

No. 2174.

ARGUED JANUARY 14, 15, 16; JUNE 4, 1936.　　　　　DECIDED JULY 25, 1936.

BANKS AND PETERS, JJ., COKE, C. J., DISQUALIFIED.

OPINION OF THE COURT BY BANKS, J.

By written stipulation of the parties which appears in the record, this case was submitted for decision to the court with only two of its justices sitting.

In 1913 the territorial legislature created a public utilities commission and conferred upon it and each of its members certain powers. Among these powers was included the broad one of exercising general supervision over all public utilities doing business in the Territory. More specifically, the commission and each member thereof was empowered to "examine into the condition of each public utility doing business in the Territory, the manner in which it is operated with reference to the safety or accommodation of the public, the safety, working hours and wages of its employees, the fares and rates charged by it, the value of its physical property, the issuance by it of stocks and bonds, and the disposition of the proceeds thereof, the amount and disposition of its income, and all its financial transactions, its business relations with other persons, companies or corporations, its compliance with all applicable territorial and Federal laws and with the provisions of its franchise, charter and articles of association, if any, its classifications, rules, regulations, practices and service, and all matters of every nature affecting the relations and transactions between it and the public or persons or corporations. Any such investigation may be made by the commission on its own motion, and shall be made when requested by the public utility to be investigated, or upon a sworn written complaint to the commission, setting forth any prima facie cause of complaint. All hearings conducted by the commisssion shall be open

to the public. A majority of the commission shall constitute a quorum." R. L. 1925, § 2193.

The commission is also given the following powers: "If the commission shall be of the opinion that any public utility is violating or neglecting to comply with any territorial or federal law, or any provision of its franchise, charter, or articles of association, if any, or that changes, additions, extensions or repairs are desirable in its plant or service in order to meet the reasonable convenience or necessity of the public, or to insure greater safety or security, or that any rates, fares, classifications, charges or rules are unreasonable or unreasonably discriminatory, or that in any way it is doing what it ought not to do, or not doing what it ought to do, it shall in writing inform the public utility of its conclusions and recommendations, shall include the same in its annual report, and may also publish the same in such manner as it may deem wise. The commission shall have power to examine into any of the matters referred to in section 2193, notwithstanding that the same may be within the jurisdiction of the interstate commerce commission, or within the jurisdiction of any court or other body, and when after such examination the commission shall be of the opinion that the circumstances warrant, it shall be its duty to effect the necessary relief or remedy by the institution and prosecution of appropriate proceedings or otherwise before the interstate commerce commission, or such court or other body, in its own name or in the name of the Territory, or in the name or names of any complainant or complainants, as it may deem best." R. L. 1925, § 2201.

The legislative enactment also contains the following provisions: "There shall also be paid to the commission in each of the months of March and September in each year by each public utility which is subject to investigation by the commission a fee which shall be equal to one-twentieth of one per cent. of the gross income from the public utility business carried on by such public utility

in the Territory during the preceding year, plus one-fiftieth of one per cent. of the par value of the stock issued by such public utility and outstanding on December 31 of the preceding year, if its principal business is that of performing public utility services in the Territory. Such fee shall likewise be deposited in the treasury to the credit of the fund. The moneys in the fund are appropriated for the payment of all salaries, wages and expenses authorized or prescribed by this chapter." R. L. 1925, § 2207.

It was for the recovery of a judgment for these fees alleged to be due for the years 1923—1930 inclusive, and aggregating $33,724.44, that the instant suit was brought. The court below trying the case, jury waived, rendered a judgment in favor of the plaintiff in the sum of $53,435.55, which included principal and interest. The defendant brings the case here on a writ of error.

A preliminary question must first be disposed of. It appears from the record in this case that the defendant did not, prior to the issuance of the writ of error, file with the clerk a bond as required by section 3556, R. L. 1935, but in lieu and instead thereof by stipulation of the parties, deposited with the clerk a certified check for $60,000, that being the amount required by the statute in case a bond had been given. Prior to the argument of the case on its merits doubt was expressed by a member of the court as to whether the giving of a statutory bond was necessary to the jurisdiction of the court and therefore could not be waived by consent of the parties. The court requested briefs on this question. Counsel for the defendant in error asked to be excused from filing a brief on the ground that it might be inconsistent with the stipulation of his client. Thereupon the court appointed Mr. Carl Wendell Carlsmith, a member of the bar, as *amicus curiae* to render to the court the required service. Elaborate and able briefs were accordingly filed by counsel for plaintiff in error and by the *amicus curiae*. After careful

study of the question the court reached the conclusion that the statutory bond was a procedural and not a jurisdictional matter and hence could be waived. The case is therefore considered on its merits.

The record discloses and it was found by the court below to be a fact that 75% of the defendant's gross annual freight receipts was derived from freight carried by it in commerce with foreign nations and among the several States. From this fact the defendant contends that the judgment under review is erroneous. More specifically the contention is that the fees sought to be collected constitute an unlawful burden upon the defendant's national and international commerce and are therefore in contravention of the commerce clause of the Federal Constitution. In considering this contention it must be remembered that the defendant is a domestic public utilities corporation, having derived its existence and its powers from local legislative authority, and that all its property holdings are located entirely within the Territory of Hawaii and all its activities are there conducted.

When this case was formerly before this court on reserved questions it was definitely held that "it has long since been well established judicially that the investigation and the regulation of public utility corporations is a rightful subject of legislation" and "since the power to investigate exists, the power to exact fees to defray the expenses of such investigations follows." *Territory* v. *I.-I. S. N. Co.*, 32 Haw. 127, 131, 138. We are in complete accord with this pronouncement and reaffirm it as being entirely sound. With this in mind let us inquire whether the commerce clause of the Federal Constitution was violated by the imposition of the fees in question. The powers conferred by the legislature upon the public utilities commission are very comprehensive and are summarized as follows: To supervise all public utilities doing business within the Territory. There was thus delegated to the commission, so far as these utilities are concerned,

the great police power of the Territory. It is by the exercise of this power that the Territory, through its commission, is enabled to ascertain whether any public utility coming within its jurisdiction is conducting the whole or any part of its business in a manner contrary to the public welfare and to take whatever steps it is authorized to take to correct such evils as may be found to exist. The supreme purpose of this power is to protect the safety of the people and so vital is it to this purpose that the commerce clause of the Federal Constitution has often been held not to interfere with its exercise. The necessity for police supervision, so far as the defendant is concerned, arises out of the fact that it is empowered to and is engaged in a business which, directly and to a large extent, affects the public welfare.

It is essential to the well-being of the public which is obliged to patronize it that the defendant be kept under official scrutiny. By the nature of its business it has made this surveillance necessary, and it is not only just but we think legal that it be required to make reasonable contributions to a fund to be used exclusively for the maintenance of the agency authorized to perform the duty.

It was decided by this court in *Territory* v. *I.-I. S. N. Co., supra,* that the Territory has not been deprived of the power of investigation. Speaking on this subject the court said (p. 138) : "The power to legislate on all rightful subjects of legislation was given to the legislature by the Organic Act in unambiguous terms. The intent to withdraw that power from the legislature, in so far as mere investigations of and complaints against a public utility doing business within this Territory are concerned, is not discernible in the Shipping Board Act." The power of the Territory to investigate the activities of the defendant being thus established in this jurisdiction the Territory may, in the exercise of this police power, legitimately impose upon the defendant's national and international

commerce, incidental and indirect burdens unembarrassed by the commerce clause of the Federal Constitution.

After diligent and laborious search by court and counsel it must be confessed that no case has been discovered which is entirely analogous in its facts to the case at bar. We are obliged therefore to rely on such judicial precedents as seem to announce principles which are helpful in the solution of the problem we are now considering.

In *Morf* v. *Bingaman* (U. S. Adv. Sh.), 80 L. Ed. 840, 56 S. Ct. 756 (decided May 18, 1936), the law of New Mexico forbade the use of state highways for the transportation of any motor vehicle on its own wheels for the purpose of sale within or without the State unless the vehicle was licensed by the State or owned by a licensed dealer and operating under a dealer's license or operating under a special permit issued by the state commissioner of revenue. The charge for the permit was $7.50 for each vehicle if transported by its own power and $5 per vehicle if it was towed or drawn by another vehicle. The appellant, Morf, was engaged in the business of purchasing automobiles in States other than New Mexico and transporting them on their own wheels through New Mexico to California, where they were offered for sale. One of the grounds upon which the appellant assailed the statute was that it imposed an unconstitutional burden on interstate commerce. In affirming the trial court which sustained the law the court said: "It [the fee] is not shown to exceed a reasonable charge for the privilege and for defraying the cost of police regulation of the traffic involved, such as a state may impose, if non-discriminatory, on automobiles moving over its highways interstate. *Hendrick* v. *Maryland*, 235 U. S. 610; *Kane* v. *New Jersey*, 242 U. S. 160; *Clark* v. *Poor*, 274 U. S. 554; *Interstate Transit, Incorporated* v. *Lindsey*, 283 U. S. 183; *Aero Mayflower Transit Co.* v. *Georgia Public Service Commission*, 295 U. S. 285. The facts, as stipulated, establish that the transportation of automobiles across the state in cara-

vans, for purposes of sale, is a distinct class of business, of considerable magnitude. Large numbers of such cars move over the highways in caravans or processions. Seventy-five to eighty per cent of the cars in appellant's caravans are in units of two, coupled together by tow bars. Each unit is in charge of a single driver, who operates the forward car and thus controls the movement of both cars by the use of the mechanism and brakes of one. Appellant's drivers, except two or three regularly employed, are casually engaged. They usually serve without pay and bear their own expenses in order to secure transportation to the point of destination, although a few receive very small remuneration and expenses. The legislature may readily have concluded, as did the trial court, that the drivers have little interest in the business or the vehicles they drive and less regard than drivers of state licensed cars for the safety and convenience of others using the highways. The evidence supports the inference that cars thus coupled and controlled frequently skid, especially on curves, causing more than the usual wear and tear on the road; that this and other increased difficulties in the operation of the coupled cars, and the length of the caravans, increase the inconvenience and hazard to passing traffic. Car trouble to any one car sometimes results in stalling the entire caravan. The state has found it expedient to make special provisions for the inspection and policing of caravans moving in this traffic. There is ample support for a legislative determination that the peculiar character of this traffic involves a special type of use of the highways, with enhanced wear and tear on the roads and augmented hazards to other traffic, which imposes on the state a heavier financial burden for highway maintenance and policing than do other types of motor car traffic. We cannot say that these circumstances do not afford an adequate basis for special licensing and taxing provisions, whose only effect, *even when applied to interstate traffic, is to enable the state to police it, and to im-*

*pose upon it a reasonable charge, to defray the burden of this state expense,* and for the privilege of using the state highways." (Italics ours.)

So in the case before us the very fact that the defendant is engaged in a business affected with a public interest renders police supervision necessary for the public weal. Therefore in order to relieve the Territory of the additional expense of maintaining the commission the burden should be placed upon the utilities whose existence and activities render the supervision, out of which the expense arises, necessary. This is exactly what was done in the *Morf* case, where it was held that the imposition of the burden upon the plaintiff was not forbidden by the commerce clause of the Federal Constitution.

In the *Railroad Commission Cases*, 116 U. S. 307, the State of Mississippi enacted a law entitled "An Act to provide for the regulation of freight and passenger rates on railroads in this State, and to create a commission to supervise the same, and for other purposes." Among other things it required all railroads operating in the State to file tariff charges with the railroad commission; to post at each of its depots all rates, schedules and tariffs; to furnish the commission with all information relating to the management of their respective lines, and particularly with copies of their leases, contracts, and agreements for transportation with express, sleeping-car or other companies; to report accidents to the commission; to make to the commission quarterly returns embracing all receipts and expenditures; to provide at least one comfortable and suitable reception room at each depot and to keep in the reception room a bulletin board showing the time of arrival and departure of trains. One of the grounds upon which suit was brought to enjoin the railroad commission from enforcing the provisions of the statute against the Mobile and Ohio Railroad Company, a public utility incorporated in Mississippi and other States, was that the utility was engaged in interstate

commerce and therefore the statute was in violation of the commerce clause. Speaking on this subject, the court said (pp. 333, 334, 335) : "There can be no doubt that each of the States through which the Mobile and Ohio Railroad passes incorporated the company for the purpose of securing the construction of a railroad from Mobile, through Alabama, Mississippi, Tennessee, and Kentucky, to some point near the mouth of the Ohio River, where it would connect with another railroad to the lakes, and thus form a continuous line of inter-state communication between the Gulf of Mexico in the south, and the Great Lakes in the north. It is equally certain that Congress aided in the construction of parts of this line of road so as to establish such a route of travel and transportation. But it is none the less true that the corporation created by each State is for all the purposes of local government a domestic corporation, and that its railroad within the State is a matter of domestic concern. Every person, every corporation, everything within the territorial limits of a State is while there subject to the constitutional authority of the State government. Clearly under this rule Mississippi may govern this corporation, as it does all domestic corporations, in respect to every act and everything within the State which is the lawful subject of State government. It may, beyond all question, by the settled rule of decision in this court, regulate freights and fares for business done exclusively within the State, and it would seem to be a matter of domestic concern to prevent the company from discriminating against persons and places in Mississippi. So it may make all needful regulations of a police character for the government of the company while operating its road in that jurisdiction. In this way it may certainly require the company to fence so much of its road as lies within the State; to stop its trains at railroad crossings; to slacken speed while running in a crowded thoroughfare; to post its tariffs and time-tables at proper places, and other things

of a kindred character affecting the comfort, the convenience, or the safety of those who are entitled to look to the State for protection against the wrongful or negligent conduct of others. This company is not relieved entirely from State regulation or State control in Mississippi simply because it has been incorporated by, and is carrying on business in, the other States through which its road runs. While in Mississippi it can be governed by Mississippi in respect to all things which have not been placed by the Constitution of the United States within the exclusive jurisdiction of Congress, that is to say, using the language of this court in *Cardwell* v. *Bridge Co.,* 113 U. S. 205, 210, 'when the subjects on which it is exerted are national in their character, and admit and require uniformity of regulations affecting alike all the States.' Under this rule nothing can be done by the government of Mississippi which will operate as a burden on the inter-state business of the company or impair the usefulness of its facilities for inter-state traffic. It is not enough to prevent the State from acting that the road in Mississippi is used in aid of inter-state commerce. Legislation of this kind to be unconstitutional must be such as will necessarily amount to or operate as a regulation of business without the State as well as within."

*Munn* v. *Illinois,* 94 U. S. 113, was a case involving an Act of the State of Illinois to regulate public warehouses and the warehousing and inspection of grain. Munn and Scott, the managers and lessees of a public warehouse located in Chicago, were prosecuted and convicted for violating two of the provisions of the statute in that they failed to procure a license for the transaction of their business as provided by the law and fixed storage charges higher than the prescribed maximum. In defense they urged the unconstitutionality of the statute on the ground, among others, that it was repugnant to the commerce clause and the sixth clause of section 9, article I of the Federal Constitution. In sustaining the Act Mr. Chief

Justice Waite said in part (pp. 130, 131, 132, 135):
"Common carriers exercise a sort of public office, and
have duties to perform in which the public is interested.
* * * When private property is devoted to a public use,
it is subject to public regulation. It remains only to as-
certain whether the warehouses of these plaintiffs in er-
ror, and the business which is carried on there, come
within the operation of this principle. * * * 'The great
producing region of the West and North-west sends its
grain by water and rail to Chicago, where the greater part
of it is shipped by vessel for transportation to the sea-
board by the Great Lakes, and some of it is forwarded by
railway to the Eastern ports. * * * Vessels, to some ex-
tent, are loaded in the Chicago harbor, and sailed through
the St. Lawrence directly to Europe. * * * The quantity
[of grain] received in Chicago has made it the greatest
grain market in the world.' * * * Thus it is apparent
that all the elevating facilities through which these vast
productions 'of seven or eight great States of the West'
must pass on the way 'to four or five of the States on the
seashore' may be a 'virtual' monopoly. Under such cir-
cumstances it is difficult to see why, if the common car-
rier, or the miller, or the ferryman, or the innkeeper, or
the wharfinger, or the baker, or the cartman, or the hack-
ney-coachman, pursues a public employment and exercises
'a sort of public office,' these plaintiffs in error do not.
They stand, to use again the language of their counsel, in
the very 'gateway of commerce,' and take toll from all
who pass. Their business most certainly 'tends to a com-
mon charge, and is become a thing of public interest and
use.' Every bushel of grain for its passage 'pays a toll,
which is a common charge,' and, therefore, according to
Lord Hale, every such warehouseman 'ought to be under
public regulation, viz., that he * * * take but reasonable
toll.' Certainly, if any business can be clothed 'with a
public interest, and cease to be *juris privati* only,' this has
been. It may not be made so by the operation of the Con-

stitution of Illinois or this statute, but it is by the facts.
* * * We come now to consider the effect upon this stat-
ute of the power of Congress to regulate commerce.   It
was very properly said in the case of the *State Tax on
Railway Gross Receipts,* 15 Wall. 293, that 'it is not every
thing that affects commerce that amounts to a regulation
of it, within the meaning of the Constitution.'   The ware-
houses of these plaintiffs in error are situated and their
business carried on exclusively within the limits of the
State of Illinois.   They are used as instruments by those
engaged in State as well as those engaged in inter-state
commerce, but they are no more necessarily a part of com-
merce itself than the dray or the cart by which, but for
them, grain would be transferred from one railroad sta-
tion to another.   Incidentally they may become connected
with inter-state commerce, but not necessarily so.   Their
regulation is a thing of domestic concern, and, certainly,
until Congress acts in reference to their inter-state rela-
tions, the State may exercise all the powers of government
over them, even though in so doing it may indirectly
operate upon commerce outside its immediate jurisdic-
tion."   See also *Chicago, etc. R. R. Co.* v. *Iowa,* 94 U. S.
155 and *Peik* v. *Chicago, etc. Ry. Co.,* 94 U. S. 164.

In *Clyde Mallory Lines* v. *Alabama,* 296 U. S. 261, the
appellee, a state agency known as the state dock commis-
sion, was authorized to conduct the operation of all har-
bors and seaports within the State of Alabama and to
adopt rules for that purpose.  Pursuant to this power
the commission adopted a schedule of harbor fees "for
mooring and shifting vessels in the harbor, and for all
vessels of specified classes entering the harbor, including
a fee of $7.50 for vessels '500 tons and over.' "   Appellant,
the Clyde Mallory Lines, contended that the $7.50 fee con-
travened the Federal Constitution in that it was a duty of
tonnage and also that it was repugnant to the commerce
clause.   In rejecting both contentions the court said  (p.
264) :   "The $7.50 fee is conceded not to be a charge for

the use of the state docks or for mooring and shifting vessels, for which specific charges are levied. It is the only fee attributable to the general service rendered by the Commission in securing the benefits and protection of the rules to shipping in the harbor. We accept the conclusion of the state court that it is charged for a policing service rendered by the state in the aid of the safe and efficient use of its port, and we address ourselves to the question whether such a fee is forbidden by the Constitution either because it is a 'duty of tonnage' or an unwarranted burden on interstate commerce. * * * Appellant places its reliance on those cases in which a tax, levied in the guise of wharfage or a charge for medical inspection, was condemned because imposed on all vessels entering a port, whether receiving the benefit of the service or not, see *Steamship Co.* v. *Portwardens, supra; Cannon* v. *New Orleans, supra; Peete* v. *Morgan,* 19 Wall. 581. It argues that the present fees must similarly be condemned because imposed on all vessels entering the port, and points out that appellant has neither asked nor received any police service such as that which the state court regarded as the basis for the charge. But the policing of a harbor so as to insure the safety and facility of movement of vessels using it differs from wharfage or other services which benefit only the particular vessels using them. It is not any the less a service beneficial to appellant because its vessels have not been given any special assistance. The benefits which flow from the enforcement of regulations, such as the present, to protect and facilitate traffic in a busy harbor inure to all who enter it. Upon this ground, among others, a fee for half pilotage imposed upon vessels such as were not required to take a pilot was upheld in *Cooley* v. *Board of Wardens, supra,* 312, 313. We conclude that a reasonable charge for a service such as the present is neither within the historic meaning of the phrase 'duty of tonnage' nor the purpose of the constitutional prohibition. * * * The present fee to defray the

cost of a purely local regulation of harbor traffic is not an objectionable burden on commerce. State regulations of harbor traffic, although they incidentally affect commerce, interstate or foreign, are of local concern. So long as they do not impede the free flow of commerce and are not made the subject of regulation by Congress they are not forbidden. * * * And charges levied by state authority to defray the cost of regulation or of facilities afforded in aid of interstate or foreign commerce have consistently been held to be permissible. Such charges were considered and upheld in [cases cited]. A similar exercise of state power is the imposition of inspection or license fees incident to or in support of local regulations of interstate commerce. * * * Its most recent manifestation is the levy of a tax which represents a reasonable charge upon interstate automobile traffic passing over state highways, upheld in [cases cited]."

There remains for determination upon this branch of the case the question of whether or not the fees imposed are disproportionate to the reasonable expense of the execution by the public utilities commission of the statutory duties imposed upon it by the Utility Act.

The trial court at the request of the defendant found, and we think correctly, "that during the year 1922 to date 'no services were ever performed by the public utilities commission in connection with the defendant utility, and that the only time spent by the public utilities commission on the business of this defendant was on three separate occasions of one-half hour each' in which the auditor of the commission examined the defendant's books for the purpose of computing the fees to be due and that this service was only worth not to exceed $30.00 gross" and that "only such service as indicated was in fact rendered directly as a service which could be characterized as 'on behalf of the defendant.'" The learned trial judge also found as a conclusion of law that a reasonable relationship existed between the fees prescribed and the duties

which the utilities commission was created to perform. In giving his reasons on this conclusion he said in his written decision: "But it must be noted at this point that there is another question involved: not simply service rendered *to* the defendant but also the requirement of supervision and watchfulness the necessity for which is *created* by the very fact of a corporation entering the field of public utility service. As to general authority to tax such corporations see, *Kansas etc. R. Co.* v. *Botkin,* 240 U. S. 227; *St. Louis etc. R. Co.* v. *Middlekamp,* 256 U. S. 226. See also, *Delaware Railroad Tax,* 18 Wall 206, 21 L. ed. 888; *Horn Silver Mining Co.* v. *N. Y.,* 143 U. S. 305. When such corporations are permitted to do business affecting the public and are granted permission by the government, then it becomes the duty of the government to its citizens that agencies representing the public be continuously existent to supervise the activities of such companies so that the public's interest in appropriate service be protected. To be sure it might be said that the expense of such supervision should be borne out of general taxes. Yet on the other hand it might equally be said that no need for supervision exists until these corporations begin to function. Hence a method of meeting the new expense of public supervision could equally well be provided by special tax on the corporations whose business creates the necessity, segregating the proceeds for the purpose of bearing the expenses in the field requiring the service. These questions are matters of legislative policy in distributing the tax burden in such a way as to have a reasonable and general application. If Congress by creating other federal agencies has effected the necessities of supervision by the local commission over the defendant so that further and other classification of expense charges or taxes of such a supervisorial body as the local commission could be legitimately advocated, the remedy in that respect is with the legislature or Congress and not with the court. It might also be noted that the question here

under dispute is not solely one as to whether or not benefits were derived by the defendant for the existence of the commission but the reverse may also be true that the *mere existence* of the commission as an agency to watch and investigate on its own motion without turning a hand toward such investigation is of itself a detriment to conduct inimicable to the public by a utility. And the mere existence of a public body ready to act if necessary involves expense which legislation has solely placed upon those companies engaged in utility business." We are in accord with this view.

It is no legal obstacle to the collection of the fees that no investigation was made by the commission of the defendant's business during the period alleged in the complaint. (*Clyde Mallory Lines* v. *Alabama, supra,* p. 266.) If this were not true any one or all of the utilities might, by intervals of good behavior, suspend the functioning of the commission and thus defeat the plan inaugurated by the legislature for the protection of the public. The public utilities commission is in a sense like the policeman on the beat whose very presence is conducive to good order and who must be supported even though it is never necessary for him to make an arrest.

Obviously where the fees imposed for investigation include the cost of something "beyond the legitimate exercise" of the statutory duties of the commission or are so clearly excessive as to lead irresistibly to the conclusion that the fees are disproportionate to the services authorized to be rendered or are imposed for general revenue purposes, it is the duty of the court as a matter of law to refuse to sanction them. (*McLean* v. *Denver & Rio Grande R. R. Co.,* 203 U. S. 38, 55; *Brimmer* v. *Rebman,* 138 U. S. 78, 83; *Foote* v. *Maryland,* 232 U. S. 494; *Postal Telegraph-Cable Co.* v. *Taylor,* 192 U. S. 64; *Patapsco Guano Co.* v. *North Carolina,* 171 U. S. 345; *Red "C" Oil Co.* v. *North Carolina,* 222 U. S. 380; *Savage* v. *Jones,* 225 U. S. 501.) This, however, is not the situation with

which we are dealing. The fees prescribed are required to be and are in fact devoted exclusively to the performance by the utilities commission of the duties imposed upon it by the Utility Act. The employment of gross receipts and capital stock as a means of ascertaining the amount of the fees required to be paid in order to meet the expenses of the commission in the performance of its duties is a legislative determination of the reasonableness of such expenses. It does not appear from the Act itself, and the record is silent on the subject, that the amounts sought to be collected from the defendant for the years in question would exceed that necessary to meet the expense of its investigation had the commission found it necessary to perform this duty. *Prima facie* inspection fees imposed by municipal authority are reasonable. (*Western Union Tel. Co.* v. *New Hope,* 187 U. S. 419.) It is a matter peculiarly within the province of the legislature to determine and in the absence of any showing of unreasonableness the courts may not interfere. (*Foote* v. *Maryland, supra.*) The burden rested upon the defendant to show that the fees are disproportionate to the services authorized and therefore in excess of what was necessary for the performance by the commission of the duties imposed upon it by law. (*Atlantic etc. Tel. Co.* v. *Philadelphia,* 190 U. S. 160.) This it has failed to do. Under these circumstances we are unable to say as a matter of law or fact that the fees exacted are disproportionate to the services required. We think therefore they do not constitute an unlawful burden upon commerce among the several States and with foreign nations, and that the objections to the Act upon that ground are without merit. We think for the same reasons that the further contention that the imposition of the fees violates the imports and exports clauses of the Federal Constitution is likewise without merit. For like reasons the defendant's contention that the fees impose a burden upon its carriage of mail, freight and passengers, which service is performed in be-

half of the United States government, cannot be sustained. The fees are no more a burden on this service than they are a burden on national and international commerce or on imports and exports.

The defendant further challenges the Utility Act upon the grounds that the fees are so unreasonable and arbitrary and discriminatory as to be tantamount to a taking of property without due process of law and that they deny to the defendant the equal protection of the laws and therefore contravene the 5th and 14th amendments of the Federal Constitution. What we have already said on the question of whether the fees imposed are a forbidden burden on commerce is sufficient to dispose of the contention made regarding due process and equal protection of the laws.

Finally the defendant contends that the inclusion of interest in the judgment is erroneous. The Public Utility Act does not expressly impose interest on delinquent fees payable under section 2207, *supra*. It must be conceded that there is no statutory provision entitling the plaintiff to recover interest on the fees in suit from the respective dates when the same accrued. Under all the state authorities interest under such circumstances is not recoverable.

The Federal courts, however, take a different view. In the case of *Billings* v. *United States,* 232 U. S. 261, 288, the court held that in actions upon statutory obligations from an individual to the Federal government interest is allowable "in all cases where equitably due unless forbidden by statute." Mr. Chief Justice White, speaking for the court, said: "The conflict between the systems is pronounced and fundamental. In the one, the state rule, except as to contract, no interest without statute; in the United States rule, interest in all cases where equitably due unless forbidden by statute. In one no suit for taxes as a debt without express statutory authority, in the other the right to sue for taxes as for a debt in every case where

not prohibited by statute. From this review it results that the doctrine as to nonliability to pay interest for taxes which have become due which prevails in the state courts is absolutely in conflict with the doctrine applied to the same subject in this court and cannot now be made the rule without repudiating settled principles which have been here applied for many years in various aspects and without in effect disregarding the sanction either expressly or impliedly given by Congress to such rules."

It is expressly provided by the Utility Act that the fees imposed be paid by the utility to the commission. A personal debt results from the utility to the commission for the collection of which the latter may bring an action in debt. Clearly justice and equity as between the utility and the commission on the one hand and all utilities as between themselves on the other, demand that interest should accrue to the commission upon delinquent fees.

Moreover, the decisions of the United States Supreme Court, as this court has repeatedly held, are binding on this court and where a conflict occurs upon questions of substantive law between the highest courts of the States and the highest Federal court the latter controls.

After careful consideration of the errors assigned we are of the opinion that they are without merit. They are therefore overruled and the judgment appealed from is affirmed.

*J. G. Anthony* and *N. M. Newmark* (*Smith, Warren, Stanley & Vitousek* and *Robertson & Castle* with them on the briefs) for plaintiff in error.

*J. R. Cades* (*Smith, Wild, Beebe & Cades* on the brief) for defendant in error.

*C. W. Carlsmith,* amicus curiae.