# IN THE MATTER OF ISLAND AIRLINES, INC.

## No. 4212.

FEBRUARY 27, 1961.

TSUKIYAMA, C. J., CASSIDY, WIRTZ, LEWIS, JJ.,
AND CIRCUIT JUDGE DYER
ASSIGNED BY REASON OF VACANCY.

OPINION OF THE COURT BY LEWIS, J.

Island Airlines, Incorporated, referred to herein as "applicant" or "Island," on May 20, 1960, submitted to the Public Utilities Commission of the State an application which, as subsequently amended, shows as follows:

Applicant has been incorporated under the laws of the State with a present capitalization of $15,000. It intends to increase its capitalization to $250,000, "upon approval by the Commission of the rates filed herewith * * *." Its articles of association provide for this extension of the capital stock "at such time as the corporation's rate schedule is approved by the Public Utilities Commission of the State * * *." Applicant seeks approval by the Commission under R.L.H. 1955, § 104-15, of its proposed passenger tariff, Exhibit A filed with the application, and pursuant to R.L.H. 1955, § 104-16, requests approval of the Commission for the issuance of the additional stock.

Exhibit A shows that applicant proposes to operate as a common carrier of passengers by air, flying between the following points: Honolulu on the Island of Oahu, to Lihue Airport, on the Island of Kauai, and return; Honolulu, Oahu, to Kahului Airport on the Island of Maui, thence either to Hilo on the Island of Hawaii or else to Kona Airport, Kailua, Island of Hawaii, and return. Applicant also has submitted proposed fares for service between Hoolehua, Island of Molokai and various points, i.e., Kahului, Hilo, and Kona, to the east, and Honolulu and Lihue, to the west.

As above appears, all of the proposed flights are between islands. Of the eight principal islands which make up the State, the five largest would be served by applicant to some extent.

Hawaiian Airlines, Inc., and Aloha Airlines, Inc., carriers presently holding certificates issued by the Civil Aeronautics Board for interisland service in Hawaii, intervened in the proceeding before the Public Utilities Commission and also appeared here. The Civil Aeronautics Board, as *amicus curiae,* filed a statement with the Commission and submitted a brief to this court. Both the intervener airlines (referred to herein as the "interveners") and the Civil Aeronautics Board (C.A.B.) contested the Commission's jurisdiction.

It was the decision of the Commission, one member dissenting, that the Commission was "without jurisdiction to entertain this application" on the ground that section 15 of the Admission Act (P.L. 86-3, 73 Stat. 4, approved March 18, 1959) "effectively retains jurisdiction over the proposed air operation in the C.A.B." The Commission ordered the application dismissed.

This decision and order were filed August 18, 1960, and on August 19 Island appealed to this court therefrom under R.L.H. 1955, § 104-15. In the jurisdictional

statement required by Rule 3(b) (2), also 3(c), the effect of the Reorganization Act (Second Sp. S.L.H. 1959, c. 1) has not been covered. While we perceive no effect of that Act in this case, we here state the court's desire that the effect thereof be briefed in future cases involving administrative agencies.

Preliminarily, we note that the Commission said nothing in its decision concerning the proposed capital stock issuance. It is conceded by all parties that the Commission had, and it clearly did have, jurisdiction over this matter under R.L.H. 1955, § 104-16. However, according to the application, the capital stock issuance was contingent upon approval of the rates. When the Commission ruled that it had no jurisdiction over the latter, the portion of the application seeking approval of the stock issuance became moot. It is the jurisdiction of the Commission over the fixing of applicant's rates which concerns us.

Is applicant aggrieved by the Commission's decision if the Commission erred in declining jurisdiction? Our jurisdiction depends upon the answer to this question. *United States* v. *Storer Broadcasting Co.,* 351 U.S. 192, 197; *Inter-Island Resorts, Ltd.* v. *Akahane,* 44 Haw. 93, 99, 352 P. 2d 856; *Airborne Freight Corp.* v. *C.A.B.,* 257 F. 2d 210. Applicant says it has been aggrieved because, under R.L.H. 1955, § 104-15, it cannot charge any rate until fixed by the Commission and therefore cannot operate at all. In making this argument applicant necessarily assumes that what it considers the correct view of the law might be applied to it in such a way as to interfere with its operations, notwithstanding the Commission's decision. Irrespective of the effect of the *res judicata* doctrine in the ordinary case of an unreviewed Commission decision (see 42 Am. Jur., *Public Administrative Law,* §§ 161-162), judicial determination of the Commission's jurisdiction is necessary to applicant's protection in this

638

case, which involves the constitutionality of section 15 of the Admission Act. Under the circumstances applicant may appeal as a party aggrieved.

There is no question as to the status of applicant as a "public utility" within the meaning of R.L.H. 1955, § 104-1. It clearly is, and chapter 104, R.L.H. 1955, read alone, empowers the Commission to fix applicant's rates. Consideration of the situation prevailing as to common carriers by air and water immediately prior to the admission of the State is pertinent at this point.

Immediately prior to the admission of Hawaii as a State, applicant was not in existence but the interveners were. The interveners then offered, as they do now, interisland common carrier service by air as applicant proposes to do, and there also was some common carrier air service between places on the same island. However, the rates for air transportation were not being fixed by the Public Utilities Commission. It was provided by the Federal Aviation Act of 1958 that the rates for carriage by aircraft in commerce "between places in the same Territory" were to be filed with the Civil Aeronautics Board, which was empowered to reject any tariff so filed. 49 U.S.C. § 1301(3), (10), (21)(a), § 1373(a) (1958 ed.).

During Territorial status, there was considerable litigation as to interisland water carriers, involving a somewhat analogous situation. Part III of the Interstate Commerce Act, which applies to water carriers, by its terms did not apply to these carriers. 49 U.S.C. § 902(d), (i). Consequently (46 U.S.C. § 832) the Shipping Act applied. That Act provided that the rates of common carriers by water "between places in the same Territory" should be filed with the Federal Maritime Board, which was authorized to control such rates. 46 U.S.C. §§ 801, 817. It was held that these provisions of the Shipping Act gave the federal board "sole jurisdiction to regulate such rates

and charges." Congress could, and by these provisions did, "withdraw the control thereof from any local board or commission and place the same in a board created by it * * *." *Re Inter-Island Steam Nav. Co.*, 24 Haw. 136; *Territory* v. *Inter-Island Steam Nav. Co.*, 32 Haw. 127; *Inter-Island Steam Nav. Co.* v. *Territory*, 305 U.S. 306, *aff'g* 96 F. 2d 412, which *aff'd* 33 Haw. 890. Upon like reasoning Congress could and did, while Hawaii still was was a Territory, withdraw from the authority of the Public Utilities Commission the control of rates of common carriers by air between places in the Territory.

During Territorial status Congress exercised not only its power under the Commerce Clause but also its authority over the Territory as such. *Inter-Island Steam Nav. Co.* v. *Territory, supra* at 314. It was common practice to include intraterritorial commerce in the congressional definition of "interstate commerce," but that did not necessarily mean that it was such. As stated in *Territory* v. *Inter-Island Steam Nav. Co., supra* at 133:

"* * * there can be no doubt that commerce 'among the several States,' even assuming that that may mean commerce among one or more states on the one hand and a territory on the other, does not mean or include commerce between two or more points wholly within the same state or commerce between two or more points wholly within the same territory, particularly when no passage over or through another state or territory is necessary or is had in order to go from the one to the other of the two points within the same state or within the same territory."

Insofar as States are concerned, it early was held that a State, in the absence of congressional intervention, could fix the rates of water carriers for transportation between two places in the State where a part of the voyage is over open sea but not through the territory of another

State. *Wilmington Transp. Co.* v. *Railroad Commission,* 236 U.S. 151 (1915). In this situation Congress still has not intervened. See 46 U.S.C. § 801, 49 U.S.C. § 902(i) (1958 ed.). On the other hand, where a part of the voyage is through the territory of another State the congressional plan has been to place the rates of water carriers under federal regulation, the same as rail carriers which traverse the territory of another State in transporting between points in a single State. *Cornell Steamboat Co.* v. *United States,* 321 U.S. 634 (1944). To carry out "a broad plan of regulation for all types of competing interstate transportation facilities" Part III of the Interstate Commerce Act, which applies to transportation "wholly by water from a place in a State to a place in any other State" (49 U.S.C. § 902(i) (1)), has been construed as including transportation by a water carrier on the Hudson River from a New York port over New Jersey territorial waters to another New York port. *Cornell Steamboat Co.* v. *United States, supra* at 638.

The intervener airlines and C.A.B. cite *United Air Lines* v. *Public Utilities Commission,* 109 F. Supp. 13, *rev'd* 346 U.S. 402, in which air transportation between the mainland of California and Catalina Island in that State was said to be "over a place outside of the State of California" and State public utilities commission jurisdiction was said to be excluded by the following portion of the definition of "interstate air transportation" in the Federal Aviation Act of 1958, which we will refer to in this opinion as the second clause of the definition:

"* * * the carriage by aircraft of persons or property as a common carrier * * *, in commerce between, * * *
  (a) * * * places in the same State of the United States through the airspace over any place outside thereof; * * *." (49 U.S.C. § 1301(21) (1958 ed.))
The statement in *United Air Lines* was dictum, since

the judgment was reversed on the ground that the trial court should not have entertained the case. Whether Congress, as to air carriers, has departed from the policy, still continued as to water carriers, of not preempting rate-making jurisdiction when, as stated in *Wilmington Transp. Co., supra,* "[t]he sovereignty of no other jurisdiction is encountered," is a matter which deserves more consideration than it has received in the arguments in this case. It has been assumed, without discussion, that the boundary of this State is the sole criterion in applying the above-quoted second clause. However, as stated in *United States* v. *Louisiana,* 363 U.S. 1, 33, the concept of "a boundary in the sea" is "elusive" as compared with a land boundary. The congressional purpose would have to be examined if jurisdiction in this case turned upon the above-quoted second clause of the definition of "interstate air transportation" (49 U.S.C. § 1301(21) (a)). We are of the view that it does not, for reasons now stated.

Preliminarily it should be noted that, irrespective of the exact extent of congressional assumption of federal jurisdiction over the regulation of rates for carriage by aircraft in commerce between places in the same State, some jurisdiction over this matter does remain with the several States. *People* v. *Western Air Lines,* 42 Cal. 2d 621, 268 P. 2d 723. Admission of a State, in the absence of a transitional provision retaining federal jurisdiction as theretofore, would thrust upon the State immediate responsibility for this State area of regulation, which had been withdrawn from its authority during Territorial status by the provision including in the definition of "interstate air transportation" (49 U.S.C. § 1301(21) (a)) carriage by aircraft in commerce between places in the same Territory. We have concluded that Congress did not intend to shift this responsibility to the State of Hawaii until two years after the date of admission of

the State, unless the date for assumption of this responsibility was advanced by a State enactment. We agree with the conclusion reached in *Interior Airways* v. *Wien Alaska Airlines,* 188 F. Supp. 107, involving a similar situation arising upon the admission of Alaska. Accordingly, the line of cleavage between state and federal regulation under the above-quoted second clause of the definition of "interstate air transportation" need not be determined in this case.

We next note certain general principles which must be borne in mind. It is well settled that, upon admission of a State, all of the Territorial laws are abrogated except as continued in force by competent authority. *Benner* v. *Porter,* 50 U.S. (9 How.) 235; *Escanaba Co.* v. *Chicago,* 107 U.S. 678. This principle applies to the intraterritorial aspects of commerce laws. *Oklahoma, K. & M. I. Ry.* v. *Bowling,* 249 Fed. 592 (8th Cir.). As to matters strictly of State cognizance the legislative power of the State is complete, unhampered by any congressional enactments even if accepted upon the admission of the State, for each State is admitted on an "equal footing" with the others. Admission Act, sec. 1 (73 Stat. 4); *Permoli* v. *First Municipality of City of New Orleans,* 44 U.S. (3 How.) 589; *Coyle* v. *Oklahoma,* 221 U.S. 559; *City of Cincinnati* v. *Louisville & Nashville R.R.,* 223 U.S. 390; *Hawkins* v. *Bleakly,* 243 U.S. 210. But there are matters of federal cognizance where the congressional power may be sufficient to sustain the particular enactment. *United States* v. *Sandoval,* 231 U.S. 28; *State* v. *Commissioners of the Land Office,* 301 P. 2d 655 (Okla.); *Ex parte Webb,* 225 U.S. 663; *United States* v. *Wright,* 229 U.S. 226; see *Coyle* v. *Oklahoma, supra* at 570.

Section 15 of the Admission Act, *supra,* reads as follows:

"Sec. 15. All Territorial laws in force in the Terri-

tory of Hawaii at the time of its admission into the Union shall continue in force in the State of Hawaii, except as modified or changed by this Act or by the constitution of the State, and shall be subject to repeal or amendment by the Legislature of the State of Hawaii, except as provided in section 4 of this Act with respect to the Hawaiian Homes Commission Act, 1920, as amended; and the laws of the United States shall have the same force and effect within the said State as elsewhere within the United States: *Provided,* That, except as herein otherwise provided, a Territorial law enacted by the Congress shall be terminated two years after the date of admission of the State of Hawaii into the Union or upon the effective date of any law enacted by the State of Hawaii which amends or repeals it, whichever may occur first. As used in this section, the term 'Territorial laws' includes (in addition to laws enacted by the Territorial Legislature of Hawaii) all laws or parts thereof enacted by the Congress the validity of which is dependent solely upon the authority of the Congress to provide for the government of Hawaii prior to its admission into the Union, and the term 'laws of the United States' includes all laws or parts thereof enacted by the Congress that (1) apply to or within Hawaii at the time of its admission into the Union, (2) are not 'Territorial laws' as defined in this paragraph, and (3) are not in conflict with any other provision of this Act." (P.L. 86-3, § 15, 73 Stat. 11 (1959))

As stated in *United States* v. *Louisiana, supra,* "at the time of its admission" is an ambiguous expression. However, its meaning in the first sentence of section 15 is clear. The statute here speaks of the laws in force "in the Territory of Hawaii at the time of its admission." That necessarily means during Territorial status, immediately prior to the admission of the State.

Were the provisions of the Federal Aviation Act of 1958 placing under C.A.B. control the regulation of rates for carriage by aircraft in commerce between places "in the same Territory" part of the "Territorial laws" within the meaning of the above-quoted section 15? According to the definition in section 15 itself, that turns upon the question whether the validity of this part of the Federal Aviation Act of 1958 was "dependent solely upon the authority of the Congress to provide for the government of Hawaii prior to its admission into the Union."

The authority of the Congress to provide for the government of Hawaii prior to its admission into the Union was derived from Article IV, section 3, clause 2 of the Constitution of the United States. But Congress also could apply other powers in the case of a Territory when appropriate, specifically its power under the Commerce Clause. *Inter-Island Steam Nav. Co.* v. *Territory, supra* at 313-314.

Under the Commerce Clause Congress has assumed national sovereignty over the airspace of the United States, resulting in the question of just what State power has been preempted thereby. 49 U.S.C. § 1508 (1958 ed.); *Braniff Airways* v. *Nebraska State Board,* 347 U.S. 590; *Allegheny Airlines* v. *Village of Cedarhurst,* 132 F. Supp. 871, *aff'd* 238 F. 2d 812; annotation in 9 A.L.R. 2d 485. Though Congress has not preempted all rate-making authority it has considered doing so, as set out in *People* v. *Western Air Lines, supra.*

However, Congress not having in fact preempted all rate-making authority or endeavored to do so except in the Territories and possessions of the United States the preemption, as made, was dependent for its validity solely upon the power derived from Article IV, section 3, clause 2. This was "a territorial prohibition applicable to the * * * Territory because made so by Congress, irrespective

of other considerations; * * *." It was "applicable to the Territory as a Territory and as a whole * * *; and this kind of internal prohibition * * * would naturally cease with Statehood, because inconsistent with local self-government and with equality between the States." See *United States* v. *Wright, supra* at 235-237, explaining *Ex parte Webb, supra.* Therefore, this part of the Federal Aviation Act was a "Territorial law." It was because this kind of law "would naturally cease with Statehood" that section 15 was passed as a transitional provision. The validity of this transitional provision is a separate question.

That by the section 15 provision as to "Territorial laws" Congress had in view the intraterritorial coverage of commerce acts is plain from the similar provisions of the Alaska Admission Act, approved July 7, 1958, and Alaska Omnibus Act, approved June 25, 1959. P.L. 85-508, 72 Stat. 339, sec. 8(d); P.L. 86-70, 73 Stat. 141, sec. 3; *Interior Airways, Inc.* v. *Wien Alaska Airlines, Inc., supra.* This also appears from the amendment of section 15 made in passage, inserting a provision terminating the congressionally enacted Territorial laws two years after the admission of the State, which as explained at pages 4 and 26 of the Committee Report in the Senate (Sen. Rep. No. 80, 86th Cong., 1st Sess., to accompany S. 50) was to introduce a cutoff period specifically with a view to the termination of federal responsibility for the administration of laws regulating intrastate commerce.

To paraphrase the law as "continued in force" by section 15 of the Admission Act unless "modified or changed," it continues for a transitional period C.A.B. jurisdiction over carriage by aircraft in commerce between places in the same former Territory, now State, of Hawaii, the transitional period to be two years, i.e., until August 21, 1961, unless the date of assumption of State responsibility

is advanced by a State enactment. We next consider whether, within the meaning of section 15, this law was "modified or changed," either by the Admission Act or by the State Constitution, so as not to be continued in force in this manner.

No reliance is placed upon any modification by the Admission Act itself, but it is contended that there was a modification by virtue of Article XVI, section 2, of the State Constitution. Article XVI, section 2, reads in pertinent part as follows:

"All laws in force at the time this constitution takes effect and not inconsistent therewith, including, among others, acts of the Congress relating to the lands in the possession, use and control of the Territory of Hawaii, shall be the laws of the State and remain in force, mutatis mutandis, until they expire by their own limitation, or are altered or repealed by the legislature."

It is applicant's first contention that R.L.H. 1955, c. 104, was continued as a law of the State by this section 2, that if section 15 of the Admission Act is read as continuing C.A.B. jurisdiction over commerce between places in the State then there is a conflict between section 2 of Article XVI and section 15 of the Admission Act, that by reason of this conflict section 15 gives way by its terms, and that in consequence there has been restored to the Public Utilities Commission the authority withdrawn from it during Territorial status. Further, it is argued that there is a difference between the Alaska situation and the Hawaii situation because Alaska did not have a regulatory statute on its books at the time of the State's admission.

We first consider the situation in 1950, when Article XVI, section 2 was agreed upon by the delegates to the Constitutional Convention. At that time, it was not the intention of the framers that this section should continue

in effect "laws of purely federal nature, such as the Mann Act, or the Interstate Commerce laws having both an interstate commerce application and an express intraterritorial application, which, as applied to a state would be incongruous with the state system." (Com. Whole Rep. No. 25; I Proceedings of the Constitutional Convention 351.) It is important to note that the delegates did not then have before them the provision for federal enforcement of such laws for a limited period, which finally was evolved.

The application of section 2 of Article XVI is better understood by considering the case of *Chicago, R. I. & P. Ry.* v. *Holliday*, 45 Okla. 536, 145 Pac. 786, an Oklahoma case which concerned an Employers' Liability Act governing common carriers, enacted by Congress during Territorial status for the regulation of intraterritorial along with interstate commerce. The case arose after the admission of the State. At the time of the decision this congressional act already had been held unconstitutional as to interstate commerce by the Supreme Court of the United States. The Oklahoma court held that the intraterritorial aspect of the congressional act was not continued in force by section 2 of the schedule of the constitution, which provided that all laws in force in the Territory, and not repugnant to the constitution, or locally inapplicable, should remain in force in the State. Though the court deemed the congressional act in force in the Territory at the time of statehood, it held it was not continued by the State constitution, chiefly because: "Its terms covering the subject here involved were so interblended that they were indivisible."

In the Oklahoma case, the court further ruled that a Territorial statute governing the same subject also was "in force" in the Territory at the time of statehood, though not operative. After considering the effect that the con-

gressional act had had, during Territorial status, on the Territorial statute, the court held that section 2 of the schedule of the constitution adopted the Territorial statute according to its terms, and not as partially superseded during Territorial status by the act of Congress. There were several grounds for this holding, of which the following is pertinent:

"* * * From the point of view of the territory, the act of Congress was in the nature of an exception of a part of the subject from a general rule expressed in the territorial statute; and the rejection of the exception instantly left the excepted part of the subject within the operative effect of such general rule. Therefore the territorial statute in question was in force, according to its terms, when our Constitution was adopted, and was adopted by the latter as applicable to the whole subject of wrongful death." 145 Pac. at 795.

So here, the case turns on the application to be made of the rule that: " 'Where a provision which excepts a class * * * from the operation of the act is repealed, the law operates generally over the excepted class * * *.' " When that rule applies: "This is not the reviving of a repealed statute in contravention of section 20 of the Revised Laws [R.L.H. 1955, § 1-11]." *Territory* v. *Hart,* 23 Haw. 558, 560; *In re Schooner Henrietta,* 10 Haw. 241, 244; *Peoria & E. Ry.* v. *Wright,* 377 Ill. 626, 37 N.E. 2d 322. That still leaves the question whether, in view of the transitional provisions of section 15, the exception made by the Federal Aviation Act of 1958 was abrogated upon the admission of the State or not until the end of the transitional period.

During Territorial status both the Federal Aviation Act of 1958 and chapter 104, R.L.H. 1955, were "in force" but as to air carrier rates only the former was operative,

constituting an exception to chapter 104. Even though R.L.H. 1955, c. 104, was adopted by Article XVI, section 2, nevertheless the operative effect of section 104-15 thereof depends upon the abrogation of the exception. That depends in turn upon transitional provisions for federal enforcement of the Federal Aviation Act provisions for a limited period, which the delegates to the Constitutional Convention did not have before them in 1950 when the above-quoted committee report was written. Those provisions extended the exception.

The extension was not "modified or changed" by section 2 of Article XVI. True, in the absence of the transitional provisions of section 15 of the Admission Act the exception would have been abrogated by the admission of the State, and the full terms of chapter 104 would have been put into effect by section 2 of Article XVI, which would not have continued the exception. It is a case in which the one (section 15) goes further in maintaining the status quo than the other (section 2 of Article XVI). In arguing that this presents a conflict, applicant is assuming the abrogation of the exception and the immediate restoration of chapter 104, the very point in issue. Applicant, by making this assumption, in effect nullifies section 15. Section 2 of Article XVI cannot be read as a positive rejection of the extension of the Federal Aviation Act, provided for by section 15, merely because the extension would not have been effected had section 2 stood alone. The constitution must be read as a whole. Temporary extension of the Federal Aviation Act had a purpose, as pointed out below. We proceed to the question whether anything in the constitution accepted this extension.

We think the Commission and the interveners rightly contend that section 8 of Article XIV of the constitution, as amended by vote of the people at the election held June 27, 1959, constitutes an agreement on the part of

the State to continued C.A.B. jurisdiction over carriage by aircraft in commerce between places in the State during a transitional period, as provided by section 15 of the Admission Act of March 18, 1959 (P.L. 86-3). This amendment was submitted to the vote of the people pursuant to section 7(b) of the Admission Act, and under sections 1, 7(b) and 7(c) its adoption was a prerequisite to the admission of the State. As amended, this constitutional provision reads as follows:

> "All provisions of the Act of Congress approved March 18, 1959 reserving rights or powers to the United States, as well as those prescribing the terms or conditions of the grants of lands or other property therein made to the State of Hawaii are consented to fully by said State and its people." (p. 23, 1960 Supp., R.L.H. 1955.)

By section 11 of Article XIV there already had been accepted whatever provisions might be contained in the Admission Act reserving to the United States "judicial rights or powers"; so this provision presumably had to do with something else, and it seems to us that one of the additional things accepted was the continuance of C.A.B. jurisdiction for a transitional period in whatever would otherwise have been the State area of control under the general provisions of the Federal Aviation Act of 1958. Accordingly, the crucial point is the validity of the federal-state arrangement which has come about in the manner above stated.

In the case of Alaska there have been a number of cases upholding the discharge of State functions during a transitional period by an office which continues to be federally maintained. See *Metlakatla Indian Community* v. *Egan,* 363 U.S. 555 (1960), concerning the status of the interim Alaska District Court as a State court, considering appeal from 174 F. Supp. 500, and remitting the

parties to the Alaska Supreme Court, see further *Organized Village of Kake* v. *Egan,* 354 P. 2d 1108; *Ketchikan Packing Co.* v. *Seaton,* 267 F. 2d 660 (D.C. Cir. 1959), concerning the enforcement by the Secretary of the Interior of an Alaska law prohibiting fish traps; *Interior Airways, Inc.* v. *Wien Alaska Airlines, Inc., supra.* In the two cases last cited the problem was similar to that presented here, that is, the performance, during a transitional period, of what ultimately are to be State functions, by a legal entity which retains its federal status. As to the case first cited, it would seem that the federal status of the entity—the interim court—is not clear. See, further, *Parker* v. *McCarrey,* 268 F. 2d 907, and cases following at 912-913, concerning appellate jurisdiction over the interim court; *United States* v. *Egelak,* 173 F. Supp. 206, and *United States* v. *Marrone,* 172 F. Supp. 368, concerning jurisdiction of the interim court in State cases; *United States* v. *Starling,* 171 F. Supp. 47, concerning jurisdiction of the interim court in federal cases.

It is applicant's contention that the discharge of State functions by a federal entity is invalid under the Constitution of the United States and the constitution of this State, that it invades the sovereignty of the State and the principle of equality of the States upheld in *Coyle* v. *Oklahoma,* and that it constitutes an unconstitutional delegation of "an exclusive state power to a non-state agency" in violation of Article III, section 1, and Article IV, section 6, of the State Constitution. The argument is founded on the premise that what is involved here is "an exclusive state power." Irrespective of the State's boundaries, the power here involved cannot be regarded as exclusively that of the State during the transitional period, which is all that is now before us.

Considering the broad commerce and postal powers of the Congress under the Constitution of the United

States (Article I, section 8, clauses 3 and 7), the sweep of the power already exercised in the field of aviation, and the economic interest of the United States in the certificated carriers by virtue of the mail subsidy provisions (see *Western Air Lines* v. *C.A.B.*, 347 U.S. 67) as well as the temporary provisions for guaranteed loans (P.L. 85-307, 71 Stat. 629, sec. 3, as amended by section 21 of the Admission Act (P.L. 86-3, 73 Stat. 13)) we think the establishment of a sound administration in the State area was a matter of legitimate federal concern, and that steps might be taken by the federal government in collaboration with the State to further the orderly assumption of the State's duties with respect to air carriers. See *Missouri Pacific R.R.* v. *Boone*, 270 U.S. 466; *New York Central* v. *New York and Pennsylvania Co.*, 271 U.S. 124. Though R.L.H. 1955, § 104-15 would cover rate regulation, it has not been operative with respect to air carriers for more than twenty years and during the period of federal control enormous changes have come about in the field of aviation which might make further or different legislation advisable. It accordingly is not a violation of the constitutional concept of federal-state relations for the State to abstain from the exercise of the power it otherwise would enjoy over air carrier rates for a transitional period, i.e., until the State Legislature, by causing the two-year period to terminate or letting it expire, shall indicate the readiness of the State to take over this responsibility. Nor is it unconstitutional for the United States to continue, for this period, the economic regulation of air carriers in the area which the United States is prepared to hand over to the State as soon as it is ready to assume it. *Interior Airways, Inc.* v. *Wien Alaska Airlines, Inc., supra.* See also Article XIV, section 5 of the State Constitution, providing for cooperation between the State and the United States; Standing Committee Report No. 58, I Proceedings of the Constitutional Convention 209-210.

No unconstitutional delegation of powers is involved in this federal-state arrangement for orderly assumption of the State's duties with respect to air carriers. The federal government is drawing upon its own power. The constitutional provisions cited by applicant are not involved. *Cf. People* v. *Sell,* 310 Mich. 305, 321-322, 17 N.W. 2d 193, 198-199. We also find untenable applicant's argument under *Coyle* v. *Oklahoma.* There is no intent here to bind the State, the opposite intent being plainly expressed. The arrangement is temporary and reasonable. No inequality is involved. Had the people of the State been required to accede to a federal enactment in an area of no federal concern the case might stand differently, but that is not the situation here.

In adhering, as we have, solely to the question of the validity of section 15 so far as applicant is concerned we are following the well settled rule that "this court must deal with the case in hand and not with imaginary ones." *Yazoo & Miss. Valley R.R.* v. *Jackson Vinegar Co.,* 226 U.S. 217, 219; *Darnell* v. *Indiana,* 226 U.S. 390, 398; *Sprout* v. *City of South Bend,* 277 U.S. 163, 167; *Heald* v. *District of Columbia,* 259 U.S. 114, 123; *Territory* v. *Miguel,* 18 Haw. 402, 404, *error dism'd* 214 U.S. 531; *In re Craig,* 20 Haw. 483, 489, *error dism'd* 234 U.S. 752; *Territory* v. *Reyes,* 33 Haw. 180, 194, 11 Am. Jur., *Constitutional Law,* § 111. That the validity of section 15, as applied to others, is of no concern to applicant, is further shown by section 22 of the Admission Act (73 Stat. 13 (1959)).

The transitional provisions of section 15 serve a valid purpose in this case. C.A.B. jurisdiction has been continued by mutual agreement for a limited period, subject to the control of the State. Accordingly, chapter 104 has not been put into full effect yet, for it is not yet August 21, 1961 nor has the transitional period been terminated earlier by a State enactment.

Order affirmed.

*Frank D. Padgett* (*J. Garner Anthony* and *Arthur B. Reinwald* on the briefs, *Robertson, Castle and Anthony* of counsel) for appellant.

*Arthur S. K. Fong,* Deputy Attorney General, State of Hawaii, (*Shiro Kashiwa,* Attorney General, with him on the brief) for Public Utilities Commission, appellee.

*Herbert Y. C. Choy* and *Ingram M. Stainback* (*Fong, Miho, Choy and Robinson* of counsel) for intervener, Aloha Airlines, Inc., appellee.

*Richard K. Sharpless* (*Lewis, Buck and Saunders* of counsel) for intervener, Hawaiian Airlines, Inc., appellee.

*Robert A. Bicks,* Assistant Attorney General, *Richard A. Solomon,* Attorney, Department of Justice, *Franklin M. Stone,* General Counsel, Civil Aeronautics Board (with *John H. Wanner,* Deputy General Counsel, *O. D. Ozment,* Associate General Counsel, and *William F. Becker,* Attorney, Civil Aeronautics Board) filed a brief for the Civil Aeronautics Board, *amicus curiae,* but did not argue.