## INTER-ISLAND STEAM NAV. CO. v. TERRITORY OF HAWAII.
### No. 8569.

Circuit Court of Appeals, Ninth Circuit.
April 16, 1938.

A. G. M. Robertson, J. G. Anthony, and D. C. Lewis, all of Honolulu, T. H. (Robertson, Castle & Anthony, of Honolulu, T. H., of counsel), for appellant.

Urban Earl Wild and J. Russell Cades, both of Honolulu, T. H. (Smith, Wild, Beebe & Cades, of Honolulu, T. H., of counsel, for appellees.

Before GARRECHT, MATHEWS, and HANEY, Circuit Judges.

HANEY, Circuit Judge.

The applicability and validity of an act of the Territory of Hawaii levying fees on public utilities are here involved.

Appellant is a corporation duly organized prior to 1913 under the laws of the Kingdom of Hawaii, a political predecessor of the Territory of Hawaii. It is a common carrier, having owned and still owning, controlling, and operating numerous vessels and other property incidental to the transportation of passengers and freight exclusively between the different parts of the Territory.

Appellee is the Public Utilities Commission of the Territory, created by Act 89 of the Session Laws of Hawaii, 1913, p. 121, approved April 19, 1913, §§ 2189–2210, Rev.Laws of Hawaii, 1925. Among the powers conferred on appellee is that of investigation. Under section 5, Rev.

Laws Hawaii 1925, § 2193, such power extends to the condition of each utility and the manner in which it is operated, with reference to the safety or accommodation of the public; the safety, working hours, and wages of its employees; fares and rates charged by it; the value of its physical property; issuance of stocks and bonds by it and the disposition of the proceeds thereof; amount and disposition of its income; its financial transactions; its business relations with others; its compliance with territorial and federal laws, and of its franchise, charter, and articles of association; its classifications, rules, regulations, practices, and service; and "all matters of every nature affecting the relations and transactions between it and the public or persons or corporations."

In section 13, Rev.Laws Hawaii 1925, § 2201, it is provided appellee should have the power to investigate such matters even though such matters were within the jurisdiction "of the interstate commerce commission * * * or other body." It is further provided that institution of appropriate proceedings for relief before the "interstate commerce commission * * * or other body" is appellee's duty.

Appellee's investigatory powers, by section 6, Rev.Laws Hawaii 1925, § 2194, extend to books, records, contracts, maps, and other documents, and by section 7 (section 2195) to accidents and the causes thereof.

By section 14 (section 2202) it is provided that all rates and fares observed by any public utility must be "just and reasonable," and that the commission had the power, "in so far as it is not prevented by the Constitution or laws of the United States," to regulate, fix, and change such rates and fares. Section 18 (section 2208) defined "public utility" to mean and include "every * * * corporation *. * * which may own, control, operate * * * whether under a franchise, charter, license * * * or otherwise, any plant or equipment * * * directly or indirectly for public use, for the transportation of passengers or freight." Section 20 of the act (section 2210) provided that it "shall not apply to commerce with foreign nations, or commerce with the several states of the United States, except in so far as the same may be permitted under the Consti-

tution and laws of the United States." Section 21 of the act provided that it would take effect on July 1, 1913.

Section 17 of the foregoing act was amended by Act 127 of the same Session Laws, approved and effective April 28, 1913. That section took effect as a part of the original act, and provided for the fees in question. So far as it is here material, that section provides, Session Laws of Hawaii, 1913, p. 184, Rev.Laws Hawaii 1925, § 2207: " * * * There shall also be paid to the commission in each of the months of March and September in each year by each public utility which is subject to investigation by the commission a fee which shall be equal to one-twentieth of one per cent of the gross income from the public utility business carried on by such public utility in this Territory during the preceding year, plus one-fiftieth of one per cent of the par value of the stock issued by such public utility and outstanding on December 31 of the preceding year, if its principal business is that of performing public utility services in this Territory. Such fee shall likewise be deposited in the treasury to the credit of said fund [Public·Utilities Commission Fund]. The moneys in said fund are hereby appropriated for the payment of all salaries, wages and expenses authorized or prescribed by this Act."

On April 29, 1913 (one day after approval of Act 127, which amended the original act of April 19, 1913), Act 135 was approved, to become effective upon its approval by the Congress of the United States.[1] The Act of March 28, 1916, C. 53, 39 Stat. 38, approved the last-mentioned territorial act, but made additions thereto. The territorial act, with the additions of Congress italicized, is in part: "The franchises granted by [various territorial acts approved by Congress] *and all franchises heretofore granted to any other public utility or public-utility company, and all public utilities and public-utilities companies organized or operating within the Territory of Hawaii,* and the persons and corporations holding said franchises shall be subject as to reasonableness of rates, prices, and charges and in all other respects to the provisions of act eighty-nine of the laws of nineteen hundred and thirteen of said Territory creating a public-utilities commission and all amendments

_____

[1] Approval by Congress was specified, apparently pursuant to section 55 of the Hawaiian Organic Act, 48 U.S.C.A. § 562.

thereof for the regulation of public utilities in said Territory; * * * *Provided, however, That nothing herein contained shall in any wise limit the jurisdiction or powers of the Interstate Commerce Commission under the Acts of Congress to regulate commerce.*" * * *

The Shipping Act of 1916, Act of September 7, 1916, c. 451, 39 Stat. 728, as amended 46 U.S.C.A. § 801 et seq., created the United States Shipping Board. Section 1 of that act provided in part:

"When used in this chapter:

"The term 'common carrier by water in foreign commerce' means a common carrier, except ferryboats running on regular routes, engaged in the transportation by water of passengers or property between the United States or any of its Districts, Territories, or possessions and a foreign country, whether in the import or export trade. * * *

"The term 'common carrier by water in interstate commerce' means a common carrier engaged in the transportation by water of passengers or property on the high seas or the Great Lakes on regular routes from port to port between one State, Territory, District, or possession of the United States and any other State, Territory, District, or possession of the United States, or between places in the same Territory, District, or possession." 46 U.S.C.A. § 801.

Section 18, 46 U.S.C.A. § 817, provides that every "common carrier by water in interstate commerce" shall establish just and reasonable rates and fares, and shall file with the Board such rates and fares, and gives to the Board power to prescribe and order reasonable rates and fares if it finds those established by such carrier are unjust or unreasonable. The Board is also given investigatory powers by 46 U.S.C.A. §§ 812, 814, 815, 816, 817, and 820.

On September 28, 1917, appellee ordered appellant to reduce its charges for passengers and freight. Appellant appealed to the Supreme Court of the Territory which held appellant to be a "common carrier by water in interstate commerce," within the provisions of the Shipping Act; that since Congress had acted, appellee was "excluded from exercising such regulation," and that therefore appellee had no jurisdiction to make the order. In re Investigation of Inter-Island Steam Nav. Co., 24 Haw. 136, 144, 146, 148.

Appellant paid the fees prescribed by section 17 of the act creating the Commission for the years 1913 to 1922 in the total sum of $26,572.79. It did not pay any fees for the years 1923 to 1930. On June 1, 1930, appellee filed an action in the circuit court of the Territory, against appellant to recover the fees for those years, totaling $33,724.44. This sum consisted of the following items:

| Year | Gross Receipts Tax | Capital Stock Tax | Due Semi-Annually | Total For Year |
|---|---|---|---|---|
| 1923 | $ 934.50 | $1,000.00 | $1,934.50 | $3,869.00 |
| 1924 | 1,013.78 | 1,000.00 | 2,013.78 | 4,027.56 |
| 1925 | 1,085.92 | 1,000.00 | 2,085.92 | 4,171.84 |
| 1926 | 1,066.15 | 1,030.00 | 2,096.15 | 4,192.30 |
| 1927 | 1,154.85 | 1,076.00 | 2,230.85 | 4,461.70 |
| 1928 | 1,282.80 | 1,188.00 | 2,470.80 | 4,941.60 |
| 1929 | 1,356.51 | 1,300.00 | 2,656.51 | 5,313.02 |
| 1930 | 1,447.42 | 1,300.00 | 2,747.42 | 2,747.42* |
| Totals | $9,341.93 | $8,894.00 | $18,235.93 | $33,724.44 |

Appellant filed an amended demurrer. The circuit court reserved the questions of law arising for the consideration of the Supreme Court of the Territory, pursuant to section 2513, Rev.Laws Hawaii of 1925. On October 8, 1931, the Supreme Court held that the "power to investigate, to make complaint and to institute and to maintain proceedings before the shipping board is not inconsistent with the power of the shipping board to decide upon the merits of the complaint and to regulate as in its wisdom it may see fit to regulate," and that since "the power to investigate exists, the power to exact fees to defray the expenses of such investigations follows." 32 Haw. 127.

Thereafter, the amended demurrer was overruled, and appellant filed an amended answer. The parties stipulated, among other facts related above, that: " * * * The commission during the years 1923 to 1930 inclusive has performed no services specifically on behalf of the defendant and has made no investigation of the defendant except from time to time it has examined the defendant's books to determine the amount of its gross income and the amount of its capital stock outstanding for the purpose of determining the amount of fees to be due; that from and after August 7th, 1923, the defendant has made no report to the commission of accidents

---

*Payment for September not due when the action was filed.

and no complaints have been filed with the commission against the defendant requiring investigations. * * *"

The circuit court found that the only service rendered by appellee which could be characterized as one "on behalf of" appellant, was one "in which the auditor of the commission examined the defendant's books for the purpose of computing the fees to be due and that this service was only worth not to exceed $30.00 gross"; that the examinations so made were "on three separate occasions of one-half hour each." The circuit court further found that 75 per cent. of appellant's "annual gross receipts for freight" are derived from transporting (1) sugar and other freight, consigned through Honolulu to mainland or foreign ports, from various territorial ports to Honolulu for such transshipment without material break in the through journey; or (2) freight, consigned to territorial ports other than the Honolulu port from mainland or foreign ports, from Honolulu to such ports of destination; or (3) mail and rendering other services directly to the United States government.

The circuit court rendered judgment for appellee in the sum of $53,435.55, consisting of the amount of the fees ($33,724.44) and interest ($19,711.11). On appeal the Supreme Court affirmed the judgment, saying: "The record discloses and it was found by the court below to be a fact that 75% of defendant's gross annual freight receipts was derived from freight carried by it in commerce with foreign nations and among the several States." It also approved the circuit court's finding with respect to services rendered by the Commission. Appellant has brought the case here by appeal.

Appellant contends that section 20 of the act creating the Commission, Rev. Laws Hawaii 1925, § 2210, expressly excluded appellant from its operation because it was engaged in interstate and foreign commerce. The section, we think, does not so provide. Appellant is excluded "except in so far as the same may be permitted under the Constitution and Laws of the United States." In this connection appellee seems to contend that appellant was not engaged in interstate or foreign commerce within the meaning of the commerce clause in the Constitution. In addition to the findings of the courts below, the evidence concerning the nature of appellant's business disclosed receipts as follows:

| Year | Freight Revenue | U.S. Mail Revenue | Other Revenue | Total Revenue |
|---|---|---|---|---|
| 1922 | $1,078,517 | $ 68,724 | $ 721,757 | $1,868,998 |
| 1923 | 1,167,230 | 70,098 | 790,234 | 2,027,562 |
| 1924 | 1,235,313 | 70,098 | 866,444 | 2,171,855 |
| 1925 | 1,234,624 | 70,098 | 827,570 | 2,132,292 |
| 1926 | 1,293,035 | 85,299 | 883,887 | 2,262,221 |
| 1927 | 1,404,079 | 100,499 | 964,571 | 2,469,149 |
| 1928 | 1,425,373 | 100,480 | 1,053,027 | 2,578,880 |
| 1929 | 1,483,388 | 99,599 | 1,120,195 | 2,703,182 |
| Totals | $10,321,559 | $664,895 | $7,227,685 | $18,214,139 |

At the trial the parties orally stipulated that 75 per cent. of the freight revenues came from one of the three sources mentioned in the trial court's finding, related above. Based on this stipulated percentage, the amount of freight coming within the three classes, and its percentage of the total revenue is as follows:

| Year | Amount | Percentage of Total Revenue |
|---|---|---|
| 1922 | $ 808,887 | 43% |
| 1923 | 875,421 | 43% |
| 1924 | 926,484 | 42% |
| 1925 | 925,968 | 43% |
| 1926 | 926,774 | 42% |
| 1927 | 1,053,057 | 42% |
| 1928 | 1,069,029 | 41% |
| 1929 | 1,112,541 | 41% |
| Period average | $ 962,270 | 42.2% |

Appellant relies on the principle that its transportation was a local part of the whole journey, and was therefore a part of interstate or foreign commerce. See Galveston, Harrisburg, etc., Ry. Co. v. Texas, 210 U.S. 217, 28 S.Ct. 638, 52 L. Ed. 1031; Atchison, Topeka, etc., Ry. Co. v. Harold, 241 U.S. 371, 36 S.Ct. 665, 60 L.Ed. 1050; Carson Petroleum Co. v. Vial, 279 U.S. 95, 49 S.Ct. 292, 73 L.Ed. 626.

The Supreme Court drew a distinction between "interstate commerce" and "Commerce * * * among the several States" as used in section 8 of article 1 in the Constitution. It is not clear as to whether or not appellee relies on such distinction. Inasmuch as it has been said that "Regulation and commerce among the states both are practical rather than technical conceptions, and, naturally, their limits must be fixed by practical lines" (Galveston, Harrisburg, etc., Ry. Co. v. Texas, supra, 210 U.S. 217, 225, 28 S.Ct. 638, 639, 52 L.Ed. 1031), we think, as a

practical matter, a territory must be considered in the same category as a state, and that the commerce clause is applicable to such territory.[2] If that point was not expressly so decided in New Mexico ex rel. McLean v. Denver & Rio Grande R. Co., 203 U.S. 38, 27 S.Ct. 1, 51 L.Ed. 78, and Hanley v. Kansas City Southern Ry. Co., 187 U.S. 617, 23 S.Ct. 214, 47 L.Ed. 333, it was so implied. Cf. Lugo v. Suazo, 1 Cir., 59 F.2d 386, 390.

The conclusion thus expressed seems to be strengthened by section 5 of the Hawaiian Organic Act, 48 U.S.C.A. § 495, which provides: "The Constitution, and, except as otherwise provided, all the laws of the United States, including laws carrying general appropriations, which are not locally inapplicable, shall have the same force and effect within the Territory of Hawaii as elsewhere in the United States."

Unless Congress would remove regulation of intraterritorial commerce from the effect of that provision, it would seem that it would restrict congressional action with regard to such commerce.

■ Appellee contends that appellant's part of the transportation was separable. We think the controlling rule is found in The Daniel Ball, 77 U.S. 557, at page 565, 10 Wall. 557, at page 565, 19 L.Ed. 999, where the court said: "In this case it is admitted that the steamer was engaged in shipping and transporting down Grand River, goods destined and marked for other States than Michigan, and in receiving and transporting up the river goods brought within the State from without its limits; but inasmuch as her agency in the transportation was entirely within the limits of the State, and she did not run in connection with, or in continuation of, any line of vessels or railway leading to other States, it is contended that she was engaged entirely in domestic commerce. But this conclusion does not follow. So far as she was employed in transporting goods destined for other States, or goods brought from without the limits of Michigan and destined to places within

that State, she was engaged in commerce between the States, and however limited that commerce may have been, she was, so far as it went, subject to the legislation of Congress. She was employed as an instrument of that commerce; for whenever a commodity has begun to move as an article of trade from one State to another, commerce in that commodity between the States has commenced. The fact that several different and independent agencies are employed in transporting the commodity, some acting entirely in one State, and some acting through two or more States, does in no respect affect the character of the transaction. To the extent in which each agency acts in that transportation, it is subject to the regulation of Congress."

See, also, United States v. California, 297 U.S. 175, 182, 56 S.Ct. 421, 423, 80 L.Ed. 567. We think, therefore, that appellant was engaged in part, at least, in "Commerce with foreign Nations, and among the several states." As such, it was subject to regulation by Congress under section 8, article 1 of the Constitution.

■ Appellee contends that Congress expressly ratified the act creating the Commission by its Act of March 28, 1916. Appellant seems not to differ with that view, and we may here assume that Congress did consent to regulation of interstate and foreign commerce within the Territory by appellee. But it is obvious that some five months later Congress withdrew its consent to regulation of such commerce, in particulars hereinafter discussed, by enactment of the Shipping Act. The effect of such action by Congress is explained by the following from Second Employers' Liability Cases, 223 U.S. 1, 55, 32 S.Ct. 169, 177, 56 L.Ed. 327, 38 L.R.A.,N.S., 44: "The inaction of Congress, however, in no wise affected its power over the subject. * * * And now that Congress has acted, the laws of the states, in so far as they cover the same field, are superseded, for necessarily that which is not supreme must yield to that which is."

To the same effect, see Chicago, R. I.,

2 That commerce among the several states is not a technical but a practical conception has been said many times. Swift & Co. v. United States, 196 U.S. 375, 398, 25 S.Ct. 276, 49 L.Ed. 518; Savage v. Jones, 225 U.S. 501, 520, 32 S.Ct. 715, 56 L.Ed. 1182; United States v. Union Pacific R. Co., 226 U.S. 64, 89, 33 S.Ct. 53, 57 L.Ed. 124; United States v. Reading Co., 226 U.S. 324, 368, 33 S.Ct. 90, 57 L.Ed. 243; Davis v. Virginia, 236 U.S. 697, 698, 35 S.Ct. 479, 59 L.Ed. 795; Public Utilities Comm. v. Landon, 249 U.S. 236, 245, 39 S.Ct. 268, 63 L.Ed. 577.

418

etc., Ry. Co. v. Hardwick Farmers' Elevator Co., 226 U.S. 426, 435, 33 S.Ct. 174, 176, 57 L.Ed. 284, 46 L.R.A.,N.S., 203.

█ The exclusive effect of congressional action is quite clear. Thus in the case last cited, it is said that "there can be no divided authority over interstate commerce." The states may not "complement" the act of Congress, or prescribe "additional regulations" or "auxiliary provisions for the same purpose" (Prigg v. Pennsylvania, 41 U.S. 539, 617, 16 Pet., 539, 617, 618, 10 L.Ed. 1060; New York Central R. Co. v. Winfield, 244 U.S. 147, 153, 37 S.Ct. 546, 61 L.Ed. 1045, L.R.A.1918C, 439, Ann.Cas.1917D, 1139), nor "supplement" such act.

Appellant contends that the Shipping Act entirely superseded the territorial act creating the Commission. Appellee contends to the contrary, but concedes that it has no power to fix or regulate rates. Appellee contends that the territorial act gave it power to investigate (as the Supreme Court held) and that that power was not superseded.

█ It was early held, and has since been followed, that Congress had no power to regulate purely intrastate commerce, a matter reserved to the states. Gibbons v. Ogden, 22 U.S. 1, 195, 9 Wheat. 1, 195, 6 L.Ed. 23; License Tax Cases, 72 U.S. 462, 470, 5 Wall. 462, 470, 18 L.Ed. 497; Kidd v. Pearson, 128 U.S. 1, 17, 9 S.Ct. 6, 32 L.Ed. 346; Carter v. Carter Coal Co., 298 U.S. 238, 298 et seq., 56 S.Ct. 855, 867 et seq., 80 L.Ed. 1160; National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 30, 57 S.Ct. 615, 621, 81 L.Ed. 893, 108 A.L.R. 1352. The limits of the reservation are shown by the Minnesota Rate Cases, 230 U.S. 352, 399, 33 S. Ct. 729, 739, 57 L.Ed. 1511, 48 L.R.A., N.S., 1151, Ann.Cas.1916A, 18, where it was said: "This reservation to the states manifestly is only of that authority which is consistent with, and not opposed to, the grant to Congress. There is no room in our scheme of government for the assertion of state power in hostility to the authorized exercise of Federal power. The authority of Congress extends to every part of interstate commerce, and to every instrumentality or agency by which it is carried on; and the full control by Congress of the subjects committed to its regulation is not to be denied or thwarted by the commingling of interstate and intrastate operations. This is not to say

that the nation may deal with the internal concerns of the state, as such, but that the execution by Congress of its constitutional power to regulate interstate commerce is not limited by the fact that intrastate transactions may have become so interwoven therewith that the effective government of the former incidentally controls the latter. This conclusion necessarily results from the supremacy of the national power within its appointed sphere."

More recently, it was said in National Labor Relations Board v. Jones & Laughlin Steel Corp., supra, 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893, 108 A.L.R. 1352: "Although activities may be intrastate in character when separately considered, if they have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions, Congress cannot be denied the power to exercise that control." See, also, Houston, etc., Texas Ry. Co. v. United States, 234 U.S. 342, 351, 34 S.Ct. 833, 58 L.Ed. 1341.

█ We may assume (without so deciding) that the provisions of the Shipping Act cited cover all the matters mentioned in the territorial act with respect to interstate commerce. In other words, in so far as the matters mentioned in the territorial act relate to interstate commerce, the territorial act was superseded by the Shipping Act; but it does not follow that the same matters in the territorial act, in so far as they related to intrastate commerce, meaning, when used herein, commerce entirely within the territory, were also acquired by the Shipping Board. The Shipping Board would acquire exclusive power over such matters only "if they have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that [interstate] commerce from burdens and obstructions."

There is nothing in the record which discloses that the intrastate matters mentioned in the territorial act bear such a close relationship to the interstate matters over which the Board has jurisdiction. In United States Nav. Co. v. Cunard S.S. Co., 284 U.S. 474, 481, 52 S.Ct. 247, 249, 76 L.Ed. 408: it is held that the Shipping Act, 46 U.S.C.A. § 801 et seq., "closely parallels the Interstate Commerce Act [49 U.S.C.A. § 1 et seq.]; and * * *

Congress intended that the two acts, each in its own field, should have like interpretation, application, and effect." In Arkansas Railroad Comm. v. Chicago, etc., R. Co., 274 U.S. 597, 603, 47 S.Ct. 724, 726, 71 L.Ed. 1224, a case involving the Interstate Commerce Commission, it was held: "The intention to interfere with the state function of regulating intrastate rates is not to be presumed. Where there is a serious doubt whether an order of the Interstate Commerce Commission extends to intrastate rates, the doubt should be resolved in favor of the state power."

■■■ Here, there is nothing to show whether the Shipping Board has or has not acted in the field of intrastate commerce with respect to the matters specified in the territorial act. We cannot presume that it has. In view of that fact, and the presumption that a statute is valid, we think it is clear that the territorial act is effective as to intrastate commerce.

■■■ However, appellant urges that the fees are invalid since they are laid on the receipts from interstate commerce, and are therefore an attempt to regulate it. That fact alone is insufficient to invalidate the exaction, we think. In Great Northern Ry. Co. v. Washington, 300 U.S. 154, at page 160, 57 S.Ct. 397, 400, 81 L.Ed. 573, where a similar fee was involved, the court said: "The supervision and regulation of the local structures and activities of a corporation engaged in interstate commerce, and the imposition of the reasonable expense thereof upon such corporation, is not a burden upon, or regulation of, interstate commerce in violation of the commerce clause of the Constitution."

Continuing, it was said in that case: "A law exhibiting the intent to impose a compensatory fee for such a legitimate purpose is prima facie reasonable. If the exaction be so unreasonable and disproportionate to the service as to impugn the good faith of the law it cannot stand either under the commerce clause or the Fourteenth Amendment."

It was there held that the burden of showing reasonableness rested on the state where interstate commerce is directly affected. On the basis of that reasoning, appellant contends that the fees exacted were "unreasonable and disproportionate to the service," and that appellee had not carried its burden. We believe appellee

"must be deemed to have sustained that burden," as stated in Bourjois, Inc., v. Chapman, 301 U.S. 183, 187, 57 S.Ct. 691, 694, 81 L.Ed. 1027. There is here no charge that the exaction is to be used for a purpose other than the legitimate one of supervision and regulation. For the 18-year period beginning with the year 1913 appellee has received fees totaling $273,470.40, and interest and miscellaneous receipts in the sum of $3,684.80. Against the total of those sums, $277,155.20, for the same period it has had disbursements of $297,578.72. We believe it to be immaterial that from 60 per cent. to 80 per cent. of those disbursements were made with respect to utilities not engaged in interstate commerce. A citizen of a city paying taxes to support a police force cannot avoid payment of the tax on the ground that he has not used the services of the police.

In view of the deficit, appellee has been able to meet the disbursements only by receipt of legislative appropriations. During the 18-year period, there have been five such appropriations, totaling $38,182.61. Had appellant paid its fees there probably would have been no necessity for the appropriations. Had appellant paid the fees, the excess of receipts over disbursements would have been $13,300.92, excluding the appropriations, for the 18-year period. The excess is insufficient to show that the fees are unreasonable or disproportionate. Cf. Bourjois, Inc., v. Chapman, supra, 301 U.S. 183, 188, 57 S.Ct. 691, 694, 81 L.Ed. 1027.

■■■ It is next contended that the fees are an unconstitutional burden on imports and exports. Article 1, section 9, of the Constitution, provides that: "No Tax or Duty shall be laid on Articles exported from any State." Article 1, section 10, provides: "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws." Appellant says that these clauses "forbid not only property taxes but any fees, charges or occupation taxes which in substance and effect burden imports or exports." See Anglo-Chilean Nitrate Sales Corp. v. Alabama, 288 U.S. 218, 227, 53 S.Ct. 373, 375, 77 L.Ed. 710. Assuming, without deciding, that the clauses are applicable to a Territory, we think such a rule has no application here. The fees are not laid on the

420

property imported or exported, on the proceeds thereof, or on the privilege of importing or exporting. The fact that appellant must pay a fee based on receipts from transporting articles imported and exported by others, has only an indirect and remote effect, if any on the imports and exports. Compare New Mexico ex rel. McLean v. Denver & Rio Grande R. Co., supra, 203 U. S. 38, 49, 27 S.Ct. 1, 51 L.Ed. 78.

Inasmuch as 5 per cent. of appellant's receipts are derived from the carriage of the mails and other services for the United States, appellant contends that the fees are a burden on an instrumentality of the United States, and are void. We are of the opinion that the fees affected, only remotely, the operations of the United States. Alward v. Johnson, 282 U.S. 509, 514, 51 S.Ct. 273, 274, 75 L.Ed. 496, 75 A.L.R. 9.

Affirmed.

MATHEWS, Circuit Judge, concurs in the result.