# IN THE MATTER OF THE APPLICATION OF ISLAND AIRLINES, INCORPORATED.

## No. 4339.

June 21, 1963.

Tsukiyama, C.J., Cassidy, Wirtz, Lewis and Mizuha, JJ.

OPINION OF THE COURT BY WIRTZ AND LEWIS, JJ.

This proceeding originated with an application of Island Airlines, Inc., herein referred to as "Island" or "applicant," which was filed with the Public Utilities Commission on July 11, 1961 and docketed on August 21, 1961,[1] seeking approval of rates and capitalization for operation of "a public utility business as a carrier of passengers by air within the State of Hawaii."

These appeals were taken by intervenors Hawaiian Airlines, Inc. and Aloha Airlines, Inc., herein sometimes referred to as "Hawaiian" and "Aloha," respectively, from Decision and Order No. 1107 of the Public Utilities Commission, filed August 16, 1962, which approved applicant's rates "for the intrastate transportation of passengers by air between the islands of Oahu, Molokai, Lanai, Maui, Hawaii and Kauai as submitted and amended," and authorized the proposed capitalization of $250,000. Two matters are involved, first, the jurisdiction of the Commission over the application and, second, the manner in which it exercised its jurisdiction.

On October 2, 1961, the intervenors filed motions chal-

---

[1] See *In re Island Airlines*, 44 Haw. 634, 361 P.2d 390.

lenging the jurisdiction of the Commission and seeking dismissal of the application. These motions presented the following grounds:

1. As stated by Aloha:[2] "The proposed flights of the Applicant would be 'between places in the same State through the airspace over any place outside thereof' within the meaning of the Federal Aviation Act of 1958 (72 Stat. 737), 49 USCA Section 1301, Subsections (10) and 21(a), and would thus be in interstate air transportation without first obtaining a certificate of convenience and necessity from said Board contrary to the prohibition contained in said act (Section 1371)."

2. As further stated by Aloha:[2] "such proposed flights would undoubtedly involve 'the carriage by aircraft of persons or property as a common carrier for compensation . . . in commerce between, respectively—

(a) *a place in any State of the United States, or the District of Columbia, and a place in any other State of the United States,* or the District of Columbia; or between places in the same State of the United States through the airspace over any place outside thereof; . . .' (Section 1301, 21 (a) (Emphasis added.)

contrary to the prohibition above-mentioned contained in said Act."

3. Hawaiian specifically contends that applicant will be engaged "in commerce" between a place in one state and a place in another state within the meaning of the Federal Aviation Act of 1958, to such extent as to "substantially affect interstate commerce"; and

---

[2] Hawaiian puts the contention this way: "* * * [T]he proposed carriage is inter-state air transportation within the meaning of the Federal Aviation Act of 1958, and is subject to the exclusive jurisdiction of the Civil Aeronautics Board." ·

4

that "the proposed carriage is interstate commerce within the meaning of Article One, Section 8 of the Constitution of the United States, and the consequences of regulation of rates therefor by the State of Hawaii will result in an unreasonable burden on interstate commerce."

By Decision and Order No. 1089 of December 20, 1961 the Commission sustained its jurisdiction and denied the motions of the intervenors to dismiss the application. The intervenors took interlocutory appeals, which were allowed by the Commission at its hearing of December 14, 1961. It was at this hearing that the Commission orally announced its decision on the motions. After allowing the interlocutory appeals it immediately set the application down for further proceedings. When the interlocutory appeals came before this court, we learned that pending the interlocutory appeals further hearings on the application had indeed been held and were nearing completion.[3] By order entered on May 4, 1962, after briefing and argument on the status of the interlocutory appeals, we ruled that "even if an interlocutory appeal lies from an order of the Public Utilities Commission, these interlocutory appeals were nonetheless improvidently and improperly allowed * * *" and ordered the same dismissed. See *Smythe* v. *Takara*, 26 Haw. 69, 70; *McCandless* v. *Carter*, 18 Haw. 218, 219; *Fraser* v. *Morrison*, 39 Haw. 370, 376.

Upon argument of the status of the interlocutory appeals questions from the bench called attention to the incompleteness of the second part of Decision and Order No. 1089, where factual matters were and are involved. Unfortunately Decision and Order No. 1107, the final action of the Commission from which these appeals were taken, failed to supply any findings in this area, which

---

[3] The last hearing was held May 8, 1962.

generally speaking is the area above designated as the second and third grounds of the intervenors' motions. We have concluded that a remand is necessary, and will proceed at once to consideration of the situation resultant from the failure to make such findings together with other matters having to do with the manner in which the Commission exercised its jurisdiction.

At a later date a supplemental opinion will be filed on the first ground of the intervenors' motions. It will suffice for now that we announce our holding that air transportation between the islands involved, referred to herein as "interisland air transportation," is within the jurisdiction of the Public Utilities Commission;[4] that an interisland air carrier does not, merely because of flying interisland, require a federal certificate from the Civil Aeronautics Board[5] under section 401 of the Federal Aviation Act of 1958 (49 U.S.C.A., § 1371); that the jurisdiction of the Civil Aeronautics Board over interisland air transportation depends upon the carriage by the carrier of persons or property "in commerce" between a place in one state and a place in another state within the meaning of the Federal Aviation Act of 1958; and that such C.A.B. jurisdiction is not exclusive of P.U.C. jurisdiction over intrastate traffic.

After the conclusion of the hearings before the Public Utilities Commission in this matter, Act 25, S.L. 1962, was approved. Effective upon its approval, May 23, 1962, Section 2, amending Section 104-15, R.L.H. 1955, took effect. As will appear, the final decision and order of August 16, 1962, did not comply with the amended section in an important respect.

As amended, Chapter 104, R.L.H. 1955, conferred upon

---

4 Sometimes referred to herein as the "P.U.C."

5 Sometimes referred to herein as the "C.A.B."

the Commission *inter alia* the following powers:

1. To fix rates, fares, and charges, which shall be "just and reasonable, and such as shall provide a fair return on the property of the utility * * * no such rate, fare, charge * * * shall be abandoned, changed, modified or departed from without the prior approval of the commission." Sec. 104-15, 1961 Supp., R.L.H. 1955.

2. To fix schedules, which shall be "just and reasonable" and "no such * * * schedule * * * shall be abandoned, changed, modified or departed from without the prior approval of the commission." Sec. 104-15, as amended, Act 25, S.L. 1962.

3. To regulate "the incurring of indebtedness relating to its public utility business, and its financial transactions * * *." Sec. 104-15, 1961 Supp.

4. To "do all things in addition which are necessary and in the exercise of such power and jurisdiction * * *." Sec. 104-15, 1961 Supp.

5. To "examine into the condition of each public utility, * * * its compliance with all applicable [State] and federal laws * * * and all matters of every nature affecting the relations and transactions between it and the public or persons or corporations." Sec. 104-6. To examine into such matters "notwithstanding that the same may be within the jurisdiction of the interstate commerce commission, or within the jurisdiction of any court or other body, and when after such examination the commission is of the opinion that the circumstances warrant, it shall effect the necessary relief or remedy by the institution and prosecution of appropriate proceedings or otherwise before the interstate commerce commission, or such court or other body, in its own name or in the name of the [State], or in the name or names of any complainant or complainants, as it may deem best." Sec. 104-14.

6. To approve the issuance of stocks, bonds and other evidences of indebtedness. Sec. 104-16.

As seen, the intervenors have contended that applicant will be engaged in interstate commerce within the meaning of the Federal Aviation Act and the Constitution of the United States, and that consequently applicant will require a federal certificate of convenience and necessity and P.U.C. entry into the regulatory field will unreasonably burden interstate commerce. Intertwined is the contention that the Commission erred in failing to consider the effect of applicant's operations upon the existing carriers. Intervenors argue that the Commission, if it had jurisdiction, had sufficient power to but did not protect the public interest in the maintenance of air transportation facilities for interisland carriage of passengers.[6]

Before considering whether applicant will be engaged in interstate commerce we will take up the manner in which the Commission has exercised the powers set out in paragraphs 1, 2, 3, 4 and 6, *supra*. The Commission approved the rates as submitted and amended but did not by its order fix Island's schedules, though schedules were submitted. The Commission is required by statute[7] to fix both rates and schedules, which may not be abandoned, changed, modified or departed from without the prior approval of the Commission. An air carrier is not free to operate in a manner which is other than or different from

---

[6] Specifications of error attacking the rates fixed by the Commission will be considered only insofar as appellant intervenors have an interest in the matter and are aggrieved. See *In re Island Airlines, supra*, 44 Haw. 634, 637, 361 P.2d 390, 392-93. For example, if the rates afford too high a profit appellants are not aggrieved thereby and such matter will not be considered. Intervenors' interest is in protecting their own business.

[7] Sec. 104-15, as amended, Act 25, S.L. 1962, provides that both rates and schedules "shall be fixed by order of the commission * * *." The statute also similarly provides for the fixing of rules and practices, and while we have not found it necessary to dwell on this feature of the statute the Commission's attention is directed to it for consideration in this connection.

8

that which the Commission has approved. This is an important part of the statutory scheme. It is not in the public interest for an air carrier to enter the field and then operate as it chooses. Were it otherwise an air carrier could operate during the peak traffic hours and offer no service at other hours despite the schedule fixed by the Commission.

The Commission's Order No. 1107 approved the proposed capitalization of $250,000 but did not require that any amount of capital be raised at any particular time. Applicant, as stated in its brief in this court, projected a capital requirement of $174,562.50 for its DC-4 operation from and to the islands of Oahu, Maui, Hawaii and Kauai, and an additional $22,600 for the DC-3 operation on the Oahu, Molokai, Lanai, Maui run. These figures included provision for operating losses from the DC-4 operation during the first three months. The Commission's decision speaks of "accepted financial requirements of approximately $150,000 for the total operations * * *." Whatever the amount of capital needed to go into service on a stable financial basis, the Commission has the authority to require that it be raised before operations commence. The power to regulate the financial transactions of the carrier and the incurring of indebtedness includes this necessary power. But since the matter is one within the discretion of the Commission this court will leave it to the Commission for consideration on remand.

Turning now to the question whether applicant will be in interstate commerce, we note that in the oral decision of December 14, 1961 announcing the denial of the intervenors' motions to dismiss the Commission had this to say:

"With relation to the matter of interstate commerce, insufficient facts have been adduced and, from the nature of the application, could not have been adduced at this time in this hearing to require a

ruling on this issue.

"While it does appear from the record that a portion of the expected traffic volume of Island Airlines, Incorporated, will be tourists, Island Airlines, Incorporated, has categorically denied that it will carry passengers under the joint-through-fare arrangement, under any common fare arrangement, or any ticketing or other arrangements with connecting carriers.

"Island Airlines' relationship with what might be considered interstate commerce appears, at most, casual and incidental to require the Commission's declining of jurisdiction in this matter at this time."

In the written Decision and Order No. 1089 of December 20, 1961, denying the motions the Commission stated as one of the issues:

> "2. Whether applicant will carry in its proposed flights passengers who are in interstate commerce and whether such carriage will subject applicant to regulation by the Civil Aeronautics Board of the United States and not by the Public Utilities Commission of the State of Hawaii."[8]

All that the Commission had to say on this issue was as follows:

"II

"With respect to the issue of whether the carriage of passengers who are in the flow of interstate commerce will automatically subject the applicant to regulation only by the Civil Aeronautics Board, the Commission feels that a ruling on this issue is not now required. The record in this hearing so far has not definitively shown to our satisfaction that applicant

---

[8] As seen this was not altogether a correct statement in that carriage of interstate passengers would not deprive the P.U.C. of jurisdiction over carriage of intrastate passengers.

will be carrying passengers in interstate commerce. On the other hand, the record does clearly show that applicant does not intend to carry passengers pursuant to any joint-through-fare arrangements, to any common fare arrangements, or to any other ticketing or other arrangements with connecting carriers. All the record shows is that a large percentage of the total volume of interisland traffic is made up of tourists. Whether these tourists are or are not in interstate commerce has not been shown. The record again does not show how many of these tourists will be carried by applicant. The record shows, however, that under the present joint-through-fare arrangements a passenger will pay the same fare as that proposed by applicant for interisland passage on aircraft of the intervenors. This raises the probability that most of the tourist travelers will then likely be obtaining passage by aircraft of intervenors rather than by aircraft of applicant. On the other hand, applicant admits that it will have no screening process to determine whether a prospective passenger on its aircraft is or is not in interstate commerce. On the whole, the Commission feels that applicant will be carrying only a small portion of the total number of tourists in interisland travel and that such carriage will constitute only a small portion of applicant's total volume of traffic. Accordingly, the Commission is of the opinion that it has jurisdiction over the proposed operations of applicant."

In its later Decision and Order No. 1107 of August 16, 1962, the Commission made no findings on the factual points left open by the above portion of Decision 1089. Thus in the first decision, No. 1089, the Commission *assumed* that Hawaiian and Aloha would be carrying interstate passengers because "under the present joint-

through-fare arrangements a passenger will pay the same fare as that proposed by applicant * * *." However, the Commission never has *decided* that these two carriers, Hawaiian and Aloha, or either of them, can operate along with another carrier that diverts from them the volume of traffic prognosticated in determining the load factor of the applicant. On the one hand, the applicant must enjoy a certain load factor in order to provide a fair return and a stable financial condition enabling it to provide the scheduled service at just and reasonable rates. On the other hand, if too much of the applicant's passenger revenues is diverted from the existing carriers (as distinguished from stimulation as new business by reason of the new service) then the question arises whether it still can be assumed that one or both of the existing carriers will continue in service and will be carrying the interstate passengers.

Following Decision No. 1089 further evidence was taken. Hawaiian and Aloha contended they would be crippled or destroyed by operation of a third carrier. The record is reviewed at a later point in this opinion. At this time we note that Kenneth Char, Executive Vice-President of Aloha Airlines testified on February 14, 1962:

"Q Mr. Char, would you tell us what you would think of a temporary experiment with either one or both of these proposals, that is, either Island or Alii or both, and what the effect of such a temporary experiment would be?

"A As I have indicated earlier in the testimony, the introduction of Island Airlines experiment would have a disastrous effect on the two carriers here, the loss of revenue equaling almost $3,000,000. We believe that this attempt would destroy Aloha Airlines. In the process Island Airlines may also go broke, but I think at the same time the two local carriers here

will be placed in the same condition and bring about a collapse of the air transportation system here in the islands."

Arthur D. Lewis, President of Hawaiian Airlines, testified on March 19, 1962:

"My feeling is—and I feel this way very strongly—that this carrier, based upon the financing it currently has, will probably not be in business for three months. It may be in business for six, depending upon the additional financing it may be able to obtain. It doesn't have the slightest chance of success.

"In the meantime, however, both Aloha and Hawaiian will be seriously hurt—and very seriously hurt—possibly involving bankruptcy.

"This last year Hawaiian Airlines had a cash flow operation which, when projected into 1962, based on the debt servicing requirement in 1962, would provide a cash flow in excess of our needs in 1962 of $175,000.00. If in 1962 we were to lose net revenues in excess of $175,000.00, we would find ourselves unable to meet our debt service needs on our long-term debt and our interest requirements for that.

"If you take Aloha Airlines' position for 1961 as far as cash flow and project it to the 1962 debt service needs, they have already got a deficit of $300,000.00. Neither carrier can take any diversion of net revenues and do anything more than default on its long-term debt, and yet this will be threatened by a carrier, in my mind, will have no chance for success."[9]

Though the Commission made no findings in this area

[9] The threat to Hawaiian and Aloha, viewed by Mr. Lewis as a temporary one for three to six months after which in his opinion Island will be out of business, necessarily is viewed by the Commission as a continuing one since it has found Island will succeed in establishing itself.

it did, over Island's objections[10] allow evidence to be introduced as to the effect of a third carrier on the other carriers. While Island objected thereto it itself had opened up this question by asking its expert, Ford Studebaker: "Do you have any opinion as to what the effect of Island Airlines' operations would be on the existing carriers?" With evidence in the record on this matter on both sides the question was squarely presented whether the assumption originally made in Decision and Order No. 1089 was correct.

As pointed out by Island, state certificating procedure was not in effect at the time of the hearings and decision below. But federal certificating procedure was in effect, and the record was such that under R.L.H. 1955, §§ 104-6 and 104-14, as set forth in paragraph 5, *supra,* the Commission had the power and duty to examine into, and if necessary effect, compliance with the federal law by all available means. Island argues that: "If, in the future, appellee, Island Airlines, should engage in interstate commerce, the Civil Aeronautics Board is perfectly capable of protecting its own jurisdiction * * *." We cannot agree that under our statute the Public Utilities Commission

---

[10] Island's position had been variously stated as follows: "The fact that our competition may be adversely affected is not really a matter which this Commission can take into consideration in the final analysis, because there is no certificate of public convenience and necessity statute. However, the only evidence in the record, and they have been at liberty to produce evidence since the November hearing, the only evidence in the record is that by Mr. Studebaker, whom I think everyone will concede is an expert, to the effect that they will not be adversely affected; that the only result of our operation will be to cause them to make needed economies and that the result will be a beneficial one to them."

"* * * [I]t is not an issue before this Commission what effect we might have upon Aloha. The question is whether the rates of Island are just and reasonable and will yield a fair return, and the question of the effect on Aloha economically is relevant to a proceeding for a certificate of public convenience and necessity, but it's scarcely relevant in this proceeding."

"* * * [T]he talk about bankruptcy. I don't really think that that is a consideration for this Commission as to what the economic effect on Aloha and Hawaiian is going to be * * *."

has no responsibility with respect to compliance with the federal law. See *Inter-Island Steam Nav. Co.* v. *Territory,* 305 U.S. 306, *affirming* 96 F.2d 412, which *aff'd* 33 Haw. 890; *Territory* v. *Inter-Island Steam Nav. Co.,* 32 Haw. 127.

Within the meaning of the Federal Aviation Act of 1958 an airline is required to be federally certificated if it is an "air carrier" engaged in "air transportation" (49 U.S.C.A., § 1371). "Air transportation" is defined for present purposes as "the carriage by aircraft of persons or property as a common carrier for compensation or hire or the carriage of mail by aircraft, in commerce between * * * a place in any State of the United States * * * and a place in any other State of the United States * * * whether such commerce moves wholly by aircraft or partly by aircraft and partly by other forms of transportation." 49 U.S.C.A., § 1301 (10) and (21).

The emphasis of the federal statute is on the movement of the person and not on the carriage by aircraft. This appears from the provision including commerce which moves partly by forms of transportation other than aircraft. This appears also from the definition of "air carrier" as an individual, partnership or corporation who undertakes to engage in air transportation "whether directly or indirectly" (49 U.S.C.A., § 1301 (3) and (13)). Therefore the criterion is the journey of the person carried. If it is an interstate journey each airline carrying the person making it is required to be certificated. *C.A.B.* v. *Friedkin Aeronautics, Inc.,* 246 F.2d 173 (9th Cir.).

An interstate journey is made by one whose point of origin is in one state while his point of destination is in another. The point of origin of the interstate journey may be a point at which the passenger commences what is purely an intrastate movement. On the other hand the intrastate movement may be merely incidental to, and not

a constituent part of, the interstate movement. This is illustrated by comparing *United States* v. *Yellow Cab Co.*, 332 U.S. 218 with *United States* v. *Capital Transit Co.*, 338 U.S. 286. In *Yellow Cab* it was held that taxicabs were not engaged in interstate commerce when transporting persons and their luggage between homes, offices and hotels in Chicago and railroad stations in Chicago. The court said:

"In a sense, of course, a traveler starts an interstate journey when he boards a conveyance near his home, office or hotel to travel to the railroad station, from which the journey is continued by train; and such a journey ends when he alights from a conveyance near the home, office or hotel which constitutes his ultimate destination. Indeed, the terminal points of an interstate journey may be traced even further to the moment when the traveler leaves or enters his room or office and descends or ascends the building by elevator.

"But interstate commerce is an intensely practical concept drawn from the normal and accepted course of business. *Swift & Co.* v. *United States*, 196 U.S. 375, 398; *North American Co.* v. *S.E.C.*, 327 U.S. 686, 705. And interstate journeys are to be measured by 'the commonly accepted sense of the transportation concept.' *United States* v. *Capital Transit Co.*, 325 U.S. 357, 363. * * *

"Here we believe that the common understanding is that a traveler intending to make an interstate rail journey begins his interstate movement when he boards the train at the station and that his journey ends when he disembarks at the station in the city of destination. What happens prior or subsequent to that rail journey, at least in the absence of some special arrangement, is not a constituent part of the interstate movement.

16

*The traveler has complete freedom to arrive at or leave the station by taxicab, trolley, bus, subway, elevated train, private automobile, his own two legs, or various other means of conveyance. * * *"* 332 U.S. at 231-32. (Emphasis added.)

In *Capital Transit* (338 U.S. 286), it was held that Capital Transit was in interstate commerce when transporting government workers by bus or streetcar in the District of Columbia from their homes to the bus terminal in the central business area of the District where they boarded buses of other companies bound for the Pentagon in Virginia. In an earlier case, *United States* v. *Capital Transit Co.*, 325 U.S. 357, the facts were different in that Capital Transit itself operated one of four bus lines from the central business area of the District of Columbia to Virginia, and it issued transfers good on that bus line. Prior to the second case Capital Transit abandoned the District-Virginia line. It was held in 338 U.S. 286 that this did not take the company out of interstate commerce. As construed in *Mateo* v. *Auto Rental Co.*, 240 F.2d 831 (9th Cir.) :

"* * * Be that as it may, it cannot be denied that the Capital Transit Co. cases involved a unique factual situation. The Company was the hub of a mass daily commuter service for thousands of workers. Conditions then existing in Washington combined to give the Transit Co. a virtual captive group of passengers. We do not feel that the decision involving such unique facts and another statute, the Motor Carrier Act, 49 U.S.C.A. § 301 et seq., should be extended to this far different situation." 240 F.2d at 835.

In the case before the court in *Mateo* there was involved the status of airporter vehicles servicing Honolulu International Airport. The court thought *Capital Transit* inapplicable, saying:

"Moreover, it would seem that common understanding dictates the conclusion we reach. When a person arrives at International Airport; steps into the Honolulu sunshine; touches his feet to terra firma; receives a friendly aloha greeting; wires news of the safe arrival back to anxious relatives and friends; and is free to select from a multitude of choices a means of transportation to his local destination, he has, 'in the commonly accepted sense of the transportation concept,' arrived in Hawaii. Those who thereafter furnish him transportation are engaged in activity of a purely local nature. * * *" 240 F.2d at 835.

But Honolulu International Airport is not the point of destination of, for example, a Hilo resident homeward bound from California. He is not free to select a means of transportation to his island from "a multitude of choices." He must continue by air. He has not reached a destination at which he is free to select his means of transportation until he arrives at Hilo's airport, General Lyman Field. That is the true destination of his interstate journey. He cannot be prevented from making an interstate journey by refusal to preticket him or to enter into any arrangements with connecting carriers. *Cf., Baltimore & Ohio S.W. R.R.* v. *Settle,* 260 U.S. 166.

We recognize that through-fare arrangements may make a local journey an integral part of interstate commerce when it otherwise would not be. *Cf., Southerland* v. *St. Croix Taxicab Ass'n,* 315 F.2d 364 (3d Cir.). In *C.A.B.* v. *Friedkin Aeronautics, Inc., supra,* 246 F.2d 173, the court indicated this to be the turning point in determining whether local California air carriers were "in commerce" when they carried passengers who were making a continuous journey via interstate and local air carriers, for example via transcontinental air carrier to Burbank, California, and via local carrier from Burbank to San

Diego, California. However, the California and Hawaiian situations are not the same. There are many means of transportation to and from Burbank. But for carriage to and from the neighbor islands passengers are dependent on air transportation.

In the situation we have here all interisland passengers are a "captive group." The trunk carriers depart from or arrive at Honolulu International Airport. Access thereto from other islands is by air. With or without through-fare arrangements there are bound to be interstate passengers traveling interisland by air. Therefore there necessarily must be at least one federally certificated air carrier in interisland service. The Commission erred in failing to consider and determine whether, with the addition of applicant's service, this will continue to be the case. If the Commission finds that such will continue to be the case, then it may assume that by reason of the attractive arrangements offered such passengers by the federally certificated carrier or carriers, Island will not be carrying interstate passengers. If the Commission does not so find then it cannot assume Island will not require a federal certificate.

In eleven out of the thirteen years preceding 1962 the two federally certificated airlines lost money prior to receiving federal subsidy. Losses in this period totaled $4,834,000. Federal subsidy payments in this period were $4,223,000. However, it is not within the prerogative of the Commission to speculate as to the continuance or amount of federal subsidy payments in future. Its problem is whether the market will support both a federally certificated service and applicant's. This problem is posed because applicant does not propose to apply for a federal certificate. Otherwise there would be no problem, as the Commission could make the obtaining of a federal certificate a prerequisite and condition the approval of the

application upon the obtaining of the federal certificate. No question of violation of federal law then would be presented.

We have considered the argument that the interstate commerce involved is minimal, preticketing aside. If a valid argument[11] it nevertheless is futile to consider it. This state will require federally certificated interisland air service no matter what approach is taken to the matter. If Island were carrying interstate passengers it could not excuse its failure to qualify under the federal statute on the ground that by abstaining from any joint-through-service arrangements it was holding such traffic to a minimum. The federal statute provides that: "It shall be the duty of every air carrier * * * to provide reasonable through service in such [interstate] air transportation in connection with other air carriers; * * * to establish, observe, and enforce just and reasonable individual and joint rates, fares, and charges * * *." (49 U.S.C.A., § 1374 (a)).

Strictly speaking, the problem now under consideration is not one that goes to the jurisdiction of the Public Utilities Commission. The second issue set out in preliminary Decision No. 1089, quoted above, was not correctly stated. Congress has not pre-empted exclusive jurisdiction over air carriers which transport both intrastate and interstate passengers. *People* v. *Western Air Lines*, 42 Cal. 2d 621, 268 P.2d 723, *appeal dism'd for want of a substantial federal question sub nom Western Airlines, Inc.* v. *California*, 348 U.S. 859. This is recognized by the provision of the federal act that: "The Board is empowered to confer with or to hold joint hearings with any State aeronautical agency, or other State agency, in connection with any matter arising under this chapter within its

---

[11] See *N.L.R.B.* v. *Fainblatt*, 306 U.S. 601, 606.

jurisdiction * * *." (49 U.S.C.A., § 1324(b)). It is well settled that a carrier having both interstate and intrastate business is subject to both state and federal control when Congress has provided for federal regulation of the former but not the latter. *The Minnesota Rate Cases,* 230 U.S. 352.

We are not called upon in this case to say to what extent the state may regulate the existing federally certificated carriers without encroaching upon the area wherein the C.A.B. has exclusive regulatory jurisdiction. Compare *Northern Natural Gas Co.* v. *State Corp. Comm'n,* 372 U.S. 84 with *Colorado Anti-Discrimination Comm'n* v. *Continental Air Lines, Inc.,* 372 U.S. 714. It is to be noted that the state statute by its terms (R.L.H. 1955, § 104-28) does not permit such encroachment.

*Railroad Comm'n* v. *Chicago, B. & Q. R.R.,* 257 U.S. 563, and *New York* v. *United States,* 257 U.S. 591, together with the predecessor *Shreveport* case (*Houston, E. & W. Tex. Ry.* v. *United States,* 234 U.S. 342), have been cited for the proposition that intrastate rates having a substantial effect on the financial position of carriers engaged in interstate commerce are subject to the provisions of the Commerce Clause of the Constitution. These cases merely hold that Congress may confer on a federal agency, and in those instances had conferred, the power to prevent unreasonable discrimination against interstate commerce by intrastate rates of carriers transporting both intrastate and interstate passengers. See also *United States* v. *Village of Hubbard,* 266 U.S. 474.

But Congress in the Federal Aviation Act of 1958 has not authorized economic regulation of airlines which are not required to be federally certificated, even if deemed necessary by the C.A.B. to protect federally certificated air carriers from competition. No such statute has been cited. Applicable here is the principle that, absent con-

gressional authority for federal regulation of intrastate rates, they remain under the jurisdiction of the states even though within reach of the federal power if the intrastate rates have a substantial effect on interstate commerce. *The Minnesota Rate Cases, supra.*

According to the Commission's estimates of Island's passenger revenues, Island will carry a total of 347,754 passengers per year, and will divert from the existing airlines 241,323 of these passengers. The Commission determined Island's load factor at 62.26% as compared with a break-even load factor of 52%. Considering the DC-4 operation alone the Commission estimated a diversion of 207,852 passengers from the existing airlines and a total of 306,644 passengers.[12]

The diversion of passengers in terms of revenue was shown by testimony of Hawaiian's witness Brian A. Cooke, Vice-President of Finance and Treasurer. Speaking of the staff estimate for the DC-4 operation he testified:

[12] Island Airlines estimated it would have 230,160 passengers per year from the DC-4 operation. (The DC-3 operation was not included in this estimate.) Island computed stimulation of new business at 15%, as compared with the Commission's estimate of 11.8%, and Hawaiian's estimate of 10%.

Hawaiian estimated Island would have only 172,660 passengers from the DC-4 operation. (As noted above Hawaiian took the position that Island would not succeed and the Commission has rejected that view.) If Island had 172,660 passengers as estimated by Hawaiian, 106,110 would be diverted from the existing airlines, a diversion of $1,196,714 per year in passenger revenues, of which Hawaiian would lose 56% and Aloha 44%, it was estimated. As to the DC-3 operation, Hawaiian estimated Island would have 35,245 passengers, while stimulated new business would be only 7,550 passengers.

Using Island's figures Aloha estimated the diversion of its own passengers at 14.9% to 20%. However, Aloha's witness Kenneth Char testified the diversion would be more like 50%, that as much as 200,000 passengers would be diverted from its line alone. But another Aloha witness, Robert J. Norris, Treasurer and Controller of that company, testified that Island's load factor would not be as claimed but "more closely approximate 41.5%." He explained "unless he (Island) is to assume a 100% load factor in some segments, which is unreasonable, the traffic simply is not there." He testified Island's revenues were "overstated by $158,000." In making these computations he was assuming Aloha and Hawaiian would meet the competition.

"* * * The staff's estimate shows a diversion of passengers from Hawaiian and Aloha of 207,852. These passengers, moving at the average fares charged by Hawaiian and Aloha over these segments, adjusted fully for dilution, produced total revenue of $2,556,745."

Speaking of the DC-3 service to Molokai and Lanai this witness said:

"The same basic result applies to the proposed Hyder DC-3 operation of Island, for Molokai-Lanai service. * * * [I]t would result in dilution—I should say diversion—of 32,000 passengers from Hawaiian and Aloha and revenues of $240,000. * * *"

On the other hand Island's witness Ford Studebaker, who qualified as an expert witness, testified:

"Q Do you have any opinion as to what the effect of Island Airlines' operations would be on the existing carriers?

"A Yes. When I first heard of this operation, proposed operation, rather, in Hawaii, the effect that the operation would have on the established carriers was the thing that came immediately to mind; however, after I looked into it a little bit more it didn't seem to be so important. So far as the present carriers are concerned, I feel that the Sky Bus type of operation is inevitable so far as Hawaii is concerned. In fact, I was rather surprised that it hadn't started here before it did on the mainland, and naturally there probably will be some slight diversion when the service first starts, that is, diverting the passengers, diverting traffic from the present carriers, Aloha and Hawaiian, and it may be that possibly for months, possibly for the first year they will not show the normal growth that they had in prior years, but I take it that it is not expected that either Aloha or Hawaiian, once the feasibility and the desirability of the Sky Bus opera-

tion is demonstrated, will stick to solely the first-class service that they are now giving, and I should certainly expect that they also will get into the Sky Bus operation, and certainly those carriers, with much broader background, better-known and with other advantages that accrue to any carrier who has been in business for a long time, will be able to take care of themselves, and in fact I should expect that in the matter of a very few years they would be making a whole lot more money and be much better off financially than they are right now."

Mr. Studebaker conceded that, where the skybus concept was in operation on the mainland "the potential traffic is far greater there than what we are talking about here." He nevertheless supported "a very minimum of 15% generation of business over-all" partly by analysis of such operations. Testifying on this subject Hawaiian's witness Brian A. Cooke stated that the growth of interisland business has "lag[ged] behind" in comparison with the mainland, and anaylzing the industry statistics he explained there had been an increase of 334% in inter-city common carrier air travel over a ten-year period as compared with a 5% increase in total inter-city common carrier travel. He testified:

"It is clear from that that a great portion of the growth realized by the air transport industry has been the diversion from other means of travel, from the railroads, busses, private automobile, to gain the growth they have realized. * * *"

As seen, the question is whether the market will support a federally certificated air service and applicant's as well. Possibly the Commission overestimated Island's passenger revenues. The Commission accepted the staff estimates; on these estimates the applicant will be making an 80% return on an investment of $250,000, the author-

24

ized capitalization. There is room for a decrease in the estimate of applicant's passenger revenues. The following points[13] are noteworthy.

(a) The staff method of estimating revenues was to determine the "stimulation" in traffic from applicant's reduced fares and attribute all this added business to Island. The stimulation was determined as a per cent of the existing business with normal growth, business not available to Island being excluded before applying this per cent. The staff then estimated the allocation among the three airlines of the existing business with normal growth, again first excluding business not available to Island. In determining the business available to Island for these two purposes, *i.e.*, stimulation and diversion, no attempt was made to exclude the preticketed interstate passengers who on the Commission's own assumption would not be flying on Island. True, Hawaiian's expert witness, Albert W. Gotch, in an exhibit which he sponsored, did not exclude these preticketed passengers, who he testified were 17% of the interisland passengers, but he used other methods which minimized the importance of this exclusion.[14] In any event, the Commission is not in a position to ignore the obvious fact that this 17%, or whatever the per cent may be determined to be, is not available to Island. Even if the existence of a carrier of-

---

[13] In conjunction with arguments as to the scope of review by this court of the Commission's findings it is to be noted that we have confined our review to those points wherein the administrative findings were "clearly erroneous," "arbitrary," or "affected by * * * error of law." R.L.H. 1955, § 6C-14(g), 1961 Supp.; R.L.H. 1955, § 104-15, 1961 Supp.; H.R.C.P., Rule 52(a). We have not found it necessary to consider whether the Administrative Procedure Act, Chapter 6C, R.L.H. 1955, 1961 Supp., has supplanted the other cited provisions. In any event the result is the same in this case.

[14] Among other differences, Mr. Gotch estimated that 75% of the traffic on present nonstop flights was not available to Island while the staff cut this to 25%. Further, Mr. Gotch tested his figures by excluding the 17% and approaching the problem from a different standpoint.

fering the same reduced rates without preticketing, should cause a decline in the number of preticketed passengers, a substantial number would remain and would not be available to Island.

(b) In determining the diversion from the existing airlines the staff explained that it was using the same method as Mr. Gotch used in allocating the traffic among the three airlines, that is, by proration according to the frequency of flights of each airline. Mr. Gotch, in turn, arrived at this method by studying operations of a California carrier, from which he concluded "the traffic is in almost direct relationship to the number of flights offered, and there is no evidence that they were able to capture more because of their reduced fare. They were able to capture only as much as the other carriers." Accordingly, he threw into one pot all available traffic, including that stimulated by decreased fares, then ladled out for each carrier its pro rata according to the frequency of flights. However, the staff, and later the Commission, rejected an essential part of Mr. Gotch's conclusion and allocated to Island *all* of the 98,792 DC-4 passengers estimated to be stimulated by the decreased fares of the applicant. When this was done there was no basis left for dividing the remaining traffic according to the frequency of flights on the theory that Mr. Gotch's testimony supported this method. What method should have been used we of course are unable to say.

(c) The staff used a dilution factor of 3% of passenger revenues as an estimate of the decrease resultant from reduced fares offered. The staff witness on this point acknowledged that he had rejected without checking evidence adduced by Hawaiian that its experience showed that children's half fares alone call for a dilution factor of 5%.

(d) The same methods used by the Commission in

estimating passenger revenues from Island's DC-4 operation were used in determining revenues from the DC-3 operation and the latter figures are subject to the same criticism as has been made above. Furthermore, the Commission has failed to make clear what is the approved rate for a flight to Maui with stopover privilege at Lanai. According to applicant's schedule it will operate a flight from Oahu to Molokai, Lanai and Maui. Originally applicant did not intend stopover privileges for such a flight. Under Decision and Order No. 1107 there are to be stopover privileges on all flights. It is obvious—in fact was developed by the testimony—that a Lanai bound passenger could buy a ticket to Maui and get off at Lanai. If, as appears to be the case, the rate for a ticket to Maui is lower than that for a ticket to Lanai then the higher rate to Lanai is an illusion unless one buying a ticket to Maui at the lower rate is not permitted to disembark at Lanai.

(e) As a factor offsetting paragraphs (a)-(d) it is noteworthy that the stimulation factor used by the staff, which was 11.8%, was conservative according to some of the evidence. The applicant used a 15% factor. According to Aloha's witness, Richard H. King, Senior Vice-President of Traffic and Sales, even this was conservative.

In summary, Island's application requires further action of the Commission with respect to schedules and determination whether the market will support a federally certificated air service and applicant's as well, including proper estimation of applicant's passenger revenues. Accordingly, the case is remanded[15] for further proceedings in conformity herewith. Whether upon remand further consideration should be given to financing or other matters not above enumerated rests in the discretion of the Commission. It also rests in the discretion of the Commission

---

15 As to the nature of the remand, see *Securities & Exchange Comm'n* v. *Chenery Corp.*, 318 U.S. 80, 332 U.S. 194.

whether or not to allow interim operations on a scheduled basis during the pendency of the further proceedings, and if so the conditions of such order. The order appealed from is set aside effective ten days after remand.

*Richard K. Sharpless* (*Lewis, Buck & Saunders* of counsel) for intervenor-appellant Hawaiian Airlines, Inc.

*Herbert Y. C. Choy* (*Fong, Miho, Choy & Robinson* of counsel) for intervenor-appellant Aloha Airlines, Inc.

*Frank D. Padgett* (*Robertson, Castle & Anthony* of counsel) for applicant-appellee Island Airlines, Inc.

*Arthur S. K. Fong,* Deputy Attorney General, (*Bert T. Kobayashi,* Attorney General, with him on the briefs) for Public Utilities Commission, appellee.

---

DISSENT OF TSUKIYAMA, C. J.

The majority of this court has epitomized its view on the jurisdictional phase of the issues involved in this case by merely announcing at this stage its ultimate conclusion, subject to the filing of a supplemental opinion at a later date, that "interisland air transportation" is within the jurisdiction of the Public Utilities Commission.

I do not concur. Realizing, in the absence of the majority's opinion *in extenso* on the jurisdictional issue, the inappropriateness of a detailed dissenting opinion which can at best be of an anticipatory nature, I shall reserve its rendition until the majority has rendered its supplemental opinion.